*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0335P (6th Cir.)
File Name: 01a0335p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
       *Plaintiff-Appellee/*
       *Cross-Appellant,*

JOSEPH CARLTON,
       *Intervening*
       *Plaintiff-Appellee,*

    *v.*

HARBERT-YEARGIN, INC.,
       *Defendant-Appellant/*
       *Cross-Appellee.*

Nos. 00-5150/5232

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 97-01112—James D. Todd, Chief District Judge.

Argued: June 8, 2001

Decided and Filed: September 21, 2001

Before: GUY, NORRIS, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Frederick J. Lewis, LEWIS, FISHER, HENDERSON & CLAXTON, Memphis, Tennessee, for Appellant. Paula Bruner, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., Michael L. Weinman, TATUM & WEINMAN, Henderson, Tennessee, for Appellees. **ON BRIEF:** John Morris Russell, Thomas L. Henderson, LEWIS, FISHER, HENDERSON & CLAXTON, Memphis, Tennessee, for Appellant. Paula Bruner, Carolyn L. Wheeler, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., Michael L. Weinman, TATUM & WEINMAN, Henderson, Tennessee, for Appellees.

GILMAN, J., announced the opinion of the court. GUY, J. (pp. 36-43), delivered a separate opinion concurring in part and dissenting in part, in which NORRIS, J., joined. The opinion of Judge Gilman affirming the district court with respect to the EEOC's cross-appeal regarding the claim of Cedric Woods is the opinion of the court. The opinion of Judge Guy reversing the district court with respect to Harbert-Yeargin, Inc.'s appeal regarding the claim of Joseph Carlton is the opinion of the court.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. This case involves a same-sex sexual harassment suit brought by the Equal Employment Opportunity Commission (EEOC) against Harbert-Yeargin, Inc. on behalf of Terry Dotson, William Doyle, and Cedric Woods, three of the company's employees. A fourth employee, Joseph Carlton, intervened. The complaint alleged that Harbert-Yeargin allowed its male employees to be subjected to unwelcome and offensive

*Id.* This certainly was not the case with Mr. Davis. He liked nothing better than to have men in the workplace. If not, who else would he roughhouse with?

Finally, in *Oncale* the court concludes with this most important pronouncement:

Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimina[tion]* because of sex."

*Id.* at 81 (ellipses omitted). I do not feel that the plaintiff has sustained this burden, nor indeed could he under these facts.

Same-sex sexual harassment cases of this nature present a slippery slope, and this case either goes over the edge or comes so close to it that a line needs to be drawn. If not, what's next—towel snapping in the locker room?

I would reverse the denial of judgment as a matter of law with respect to Carlton's sexual harassment claim.[7]

_____

[7] The effect of Judge Norris concurring in this opinion is that the judgment of the district court as to Woods is affirmed and the judgment as to Carlton is reversed. The case is remanded to the district court for entry of appropriate judgments in conformity with this opinion.

of Mr. Carlton's plight, but he had other remedies. Everything from a union grievance to a criminal complaint and a civil action for assault and battery. With a state civil action, the employer could still be a defendant and could have been liable under these facts for the actions of its agents and employees, particularly when those actions had been brought to the employer's attention. Mr. Carlton still could have found the goose that laid the golden egg without distorting the offensive sexual conduct into a civil rights violation. The issue is not "no wrong without a remedy." The issue is how far Congress can go or, more accurately, has gone to regulate conduct in the workplace. This brings me back to *Oncale*. Mr. Oncale quit his job because he thought he "would be raped or forced to have sex." The harasser was a homosexual.[6] Because this was the fact, it was easy to conclude the harasser would not have been predatory toward females. The Court goes on to state, however, that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale*, 523 U.S. at 80. The Court then offers an example that sheds some light:

> A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.

---

[6] Contrary to the dissent's suggestion, I am not implying the harasser has to be a homosexual. When the harasser is a homosexual, however, the conclusion that the harassment was gender based is defensible. In *Bibby v. Philadephia Coca Cola Bottling Co.*, 260 F.3d 257 (3d Cir. 2001), the court held a plaintiff might demonstrate that a same-sex sexual harassment claim amounted to discrimination because of sex if the harasser was motivated by sexual desire, the harasser was expressing a general hostility to the presence of one sex in the workplace, or the harasser was acting to punish the victim's noncompliance with gender stereotypes. None of these three scenarios can be gleaned from the facts in this case.

touching on the basis of sex and failed to take corrective action, thereby creating a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. A jury returned a verdict for both Carlton and Woods on their claims, awarding Carlton $1 in compensatory damages and $300,000 in punitive damages, and Woods $1 in compensatory damages and $50,000 in punitive damages. No recovery was had by either Dotson or Doyle. The district court denied Harbert-Yeargin's motion for judgment as a matter of law with respect to Carlton's claim, but granted the company's motion with respect to Woods's claim.

Harbert-Yeargin now appeals, challenging the district court's rulings that (1) denied its motion for judgment as a matter of law with regard to Carlton's claim, (2) admitted evidence that Harbert-Yeargin had engaged in similar misconduct in the past, and (3) upheld the jury's punitive damage award with regard to Carlton's claim. The EEOC cross-appeals, challenging the district court's grant of judgment as a matter of law in favor of Harbert-Yeargin regarding Woods's claim. For the reasons set forth below, I would AFFIRM the judgment of the district court on both Carlton's and Woods's claims.

## I.  BACKGROUND

### A.  Factual background

Harbert-Yeargin, a subsidiary of Raytheon Co., is a company that provided maintenance services at a Jackson, Tennessee construction site under a contract with Procter and Gamble Co. Both Carlton and Woods claim that they were the victims of same-sex sexual harassment and discrimination while employed at the Harbert-Yeargin site. In particular, they allege that they were subjected to unwanted touching, poking, and prodding in their genital areas, and to a hostile work environment that allowed such behavior to flourish.

### 1.    *Carlton's claim*

Carlton was a pipe welder who began working for Harbert-Yeargin on January 8, 1996. He was assigned to the crew of Louis Davis, whose job was to assign tasks and supervise his men. Carlton claims that Davis immediately began to bother him by getting too close and frequently touching Carlton's upper thigh.

The first time that Davis touched Carlton in his genital area was on February 6, 1996. Carlton and his pipe fitter had been working in an isolated part of the facility when Davis sent the fitter away to get new supplies, leaving Carlton alone with Davis. After the fitter left, Davis grabbed Carlton's "private area . . . just out of the blue." Then Davis "jerked his hand back and took off." Carlton told the fitter about the incident when his assistant returned, but did not file a complaint because there were no eyewitnesses and because he had only been on the job for a few weeks. After this incident, Davis kept "trying to get close" to Carlton, making it difficult for Carlton to concentrate on his welding.

The next time that Davis touched Carlton in his genital area was on Thursday, February 22, 1996. Carlton had bent over a table while welding, when he felt a hand that "kind of comes in from the backside to my testicles and kind of comes all the way around to the bottom of my back. I just threw the hood down. I almost lost it. I really did." When Carlton removed his helmet to see whose hand it was, he saw Davis "running off again, just like he did when he grabbed me the first time." The two incidents caused Carlton to feel "outraged," and both mentally and physically exhausted.

The February 22, 1996 incident was witnessed by coworker Larry Lindley, who told Carlton: "Joe, you need to see Bomar." On the following day, Carlton reported Davis's behavior to Don Bomar, the general superintendent. Bomar laughed at first, but told Carlton that he would keep Carlton's complaint confidential and would look into the matter. He

question, which it did, the form directed them to then proceed directly to assess damages.[5]

*Shepherd v. Slater Steels Corp.*, 168 F.3d 998 (7th Cir. 1999), is a good example of the analytical gymnastics in which a court will engage in order to contort sexually offensive conduct in the workplace into gender discrimination. In *Shepherd*, the sexually offensive conduct directed at the male plaintiff by one of his male coworkers was gross beyond imagination. The coworker, however, as part of his regular offensive sexual behavior, also exposed himself to at least one of the female workers. On the basis of this fact, the district court granted summary judgment to the defendant. The court of appeals reversed in a split decision, in effect holding that because there was more "flashing" of males than females, it qualified as discrimination. If Shepherd's coworker had been sexually offensive to more females, there would have been no cause of action—a holding that can hardly be thought to make females in that workforce very happy. Apparently we now have a quantitative component to the analysis. In order to escape liability, the harasser must be careful to be offensive in equal parts to all. That should make for some interesting workplace notices posted by employers: "We do not tolerate sexual harassment; but if you must, make sure you are equally gross with both sexes."

What went on in the case at bar was gross, vulgar, male horseplay in a male workplace. It was the classic example of men behaving badly. I do not mean in any way to make light

---

[5]Although the jury instructions did not properly convey what the jury needed to find, the jury did a rather remarkable job of almost getting it right. They found no cause of action except as to two plaintiffs, and only awarded them $1.00 each in compensatory damages. The punitive damages, if considered apart from the question of whether the plaintiff should have prevailed at all, are understandable since the employer did a very poor job of trying to correct a bad workplace situation of which it had knowledge.

violation of Title VII. Throughout the instructions this error is compounded. For example, the instructions later state: "An employer has a duty to take prompt and effective action to remedy complaints of sexual harassment." Although an employer may have some type of general duty, a failure to remedy complaints of sexual harassment that doesn't rise to the level of gender discrimination is not actionable under Title VII. The error is in concluding that all harassment of a sexual nature amounts, *ipso facto*, to gender discrimination.

Later, the instructions tell the jury that:

Where the harasser and the victim are both male there is an inference of discrimination because of sex when the harasser subjects only male employees to offensive or objectionable conduct of a sexual nature or the conduct is so sex specific and derogatory that the harasser is clearly motivated by a general hostility to men in the workplace.

Since there is no claim that Davis was "motivated by a general hostility to men in the workplace," I turn my attention to only the first part of this instruction. Again, it is clear that "gender" and "sex" are being conflated. First of all, if the harassment is specifically directed at men and not women, it doesn't have to be of a sexual nature. The harassment, for example, could be verbal and not involve sexual terms or innuendoes at all. Second, the jury is not being told at this point that the male-on-male harassment of the type involved in this case is only actionable under Title VII in a mixed-sex workplace. The element of gender discrimination is missing or at best obscured. The verdict form given to the jury only compounded the problem. The only substantive question the jury was asked was: "[h]as Plaintiff Joe Carlton proved by a preponderance of the evidence that Defendant subjected him to sexual harassment?" If the jury answered "yes" to that

later testified that it did not surprise him to hear that Davis had "goosed" someone. When Bomar reported Carlton's complaint to Harold Scott, the site superintendent, Bomar was directed to notify the Harbert-Yeargin home office in Greenville, South Carolina. The human resources official at corporate headquarters, Robert Cooper, instructed Bomar to transfer Carlton out of Davis's workgroup. By the time Carlton returned to work on Monday, February 26, 1996, he had been moved to another crew with a different supervisor.

According to Carlton, however, the sexual harassment continued. Carlton testified that Davis began stalking him by "stand[ing] off far enough to let me know that he was there." In addition, word leaked out that Carlton had filed a sexual harassment complaint, despite Bomar's promise to Carlton that his complaint would remain confidential. A number of Carlton's coworkers taunted Carlton repeatedly by grabbing and "hunch[ing]" on each other. They also began to call Carlton "Louie's girlfriend" and to treat him as if he had "the plague." One coworker testified that various supervisors were present when Carlton was being taunted, and that some of them joined in mocking Carlton by saying that if Carlton were a "real man," he would address the matter in a manner other than by filing a sexual harassment complaint. Even after Carlton informed Bomar about the behavior of his coworkers, the ridicule continued, finally causing Carlton to quit his job in April of 1996.

Meanwhile, on February 26, 1996, Bomar wrote up Carlton's complaint. He also told Davis about the complaint, to which Davis responded by grinning and denying that he had ever done anything to Carlton. Finally, Bomar directed Davis to document a "welding problem" allegedly caused by Carlton and to place it in Carlton's file. Bomar later admitted that this manner of documentation was contrary to company policy, which instead required a specific "verbal reprimand form" to be completed.

On March 4, 1996, Cooper, the corporate headquarters human resources representative, came to the Jackson, Tennessee site to investigate Carlton's complaint. His investigation lasted about four hours, and consisted solely of talking to Bomar, Davis, Scott, and Carlton. Bomar, Davis, and Scott all admitted that "horseplay" happened at the facility, although their stories varied as to the actual amount of horseplay involved. Carlton, however, declined to discuss his complaint with Cooper unless his attorney was present. Cooper, in turn, did not contact Carlton's attorney, even though Carlton gave Cooper his attorney's name and telephone number. He also failed to interview Lindley, who witnessed the second incident, or anyone else on Davis's crew, even though Cooper was provided with a list of their names.

At the end of his investigation, Cooper warned Bomar and Scott about the "rampant" horseplay occurring at the facility, pointed out that it violated company policy, and told them to prevent any retaliation against Carlton. Davis, however, was neither reprimanded nor disciplined as a result of Carlton's investigation, because the report to corporate headquarters concluded that no harassment had occurred.

### 2.   *Woods's claim*

Woods worked for Harbert-Yeargin from May 22, 1995 until July 11, 1996, but, unlike Carlton, was not on the crew supervised by Davis. He was first touched by Davis six months after Woods began working at the facility. The incident occurred when Woods was riding in a taxi truck full of coworkers. Davis got on the truck, put his arm around Woods, and placed his hands on Woods's "privates." Woods responded by removing Davis's hand and leaving the truck. Davis laughed, and the other employees all joked about the incident.

Afterwards, at least "two or three times a day," Davis would get up close to Woods and touch him "a lot" on various

effect. For Mr. Davis, chivalry was alive and well. For his employer, better that he were a cad.

The whole issue of a mixed-sex workplace became confused before the jury ever received this case for deliberations.[3] When defense counsel objected to the court's proposed instructions on the definition of "sexual harassment" particularly as it related to whether this was a mixed-sex workplace, the trial judge stated:

> THE COURT:   No. I'm not going to grant that, because we're not going to get into whether this was or was not a mixed workplace. I mean, there were women at the plant.

In addition, it is clear from the jury instruction conference as well as the instructions actually given that the trial judge felt it made no difference whether this was a mixed-sex workplace or not.[4] Although that may be true in some situations, it is not the theory under which this case proceeded. The instructions reflect the analytical error made by the trial judge—the same analytical error made by the dissent. The instructions the jury received started out by describing the plaintiffs' claim as follows:

> The plaintiffs claim that Joseph Carlton, Cedric Woods, Terry Dotson, and William Doyle were sexually harassed by the defendant. . . . Sexual harassment is discrimination on the basis of sex prohibited by Section 703, Title 7, of the Civil Rights Act of 1964.

Not only is the claim not described as one for gender discrimination, but the instructions tell the jurors at the outset that "sexual harassment is discrimination" that amounts to a

---

[3]Instructional error was raised on appeal.

[4]See J.A. at 496.

carried out by persons who are of the same sex as the person being "discriminated" against. Note the use of the word "discriminated" as opposed to "harassed." Although certain types of harassment may result in actionable discrimination, Title VII is not a generic anti-harassment statute. This distinction becomes important in hostile work environment cases. It is easy to see that a racially hostile work environment is generally actionable. It does not follow, however, that every "sexually" hostile work environment will ground a Title VII claim. In fact, if the environment is just sexually hostile without an element of gender discrimination, it is not actionable. Stated another way, and with apologies to Mother Goose:

Georgie Porgie pudding and pie
Goosed the men and made them cry
Upon the women he laid no hand
So it cost his employer 300 grand.

Substitute Louis Davis for Georgie Porgie and you have this case. Although the law does not always follow the dictates of common sense, it is hard for me to come to grips with the fact that if Davis had been an equal opportunity gooser, there would be no cause of action here.[2] Yet, that is the fact. In order to make this fact situation fit within the framework for actionable cases, the EEOC and the dissent had to declare that this was a mixed-sex workplace. Never mind that all members of the large, male work force worked out in the field while the total of three female workers were in an office and had no contact with Mr. Davis. Apparently it would have made no difference if the three women worked in another state in the face of Mr. Davis's self-righteous proclamation that: "Of course I didn't do that to women. What kind of a guy do you think I am?"—or words to that

---

[2]It is not disputed that this is a correct statement of the law. It is not as the dissent implies a concession on my part. Rather, this principle is cited to show why the EEOC had to proceed in this case under a mixed-sex workplace theory.

parts of his body, including his privates. Woods felt that "it wasn't right" when Davis touched him, and eventually became so uncomfortable around Davis that, when he saw Davis coming towards him, Woods would get up and run.

### 3.    *The environment at Harbert-Yeargin*

Harbert-Yeargin had both a general anti-harassment policy and a specific anti-sexual harassment policy. These policies were posted on its bulletin board at the facility. Under the anti-sexual harassment policy, "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when . . . [t]he harassment substantially interferes with an employee's work performance or creates an intimidating, hostile, or offensive work environment."

Despite the existence of these written policies, evidence presented by the EEOC indicated that many employees and supervisors were unaware of their content. Various employees testified that they had received no information concerning sexual harassment, even though, under Harbert-Yeargin's corporate procedures, they were required to be informed of its anti-harassment policies during an orientation following their hire. Even Scott, as the site superintendent, conceded that he had received no anti-sexual harassment training, despite the existence of corporate policy to the contrary.

The EEOC also presented evidence that, despite a prohibition against unwelcome physical contact of a sexual nature, the practice of "goosing" occurred among male employees at Harbert-Yeargin on a daily basis. "Goosing" consisted of getting grabbed, patted, or prodded in the buttocks or genitals. No one was ever disciplined for this conduct. William Doyle, for example, testified that he was slapped, patted, and poked on the buttocks, and that he saw this happen to other employees as well. Terry Dotson said

that two particular coworkers would often come up to him, pinch him on the thigh, and grab him between the legs.

According to several witnesses, various supervisors either participated in or witnessed goosing. Davis admitted that he goosed male employees, and testified that he saw Scott and Anthony Smith, a coworker, goose employees in the buttocks. Lindley and coworker Tony Warren both testified that they had seen Davis grab various employees' buttocks and crotches. Warren testified that Davis even twisted his nipples. In addition, Dotson and Warren testified that they saw a number of their coworkers goose other employees in the presence of various supervisors, and that the supervisors did nothing to stop it.

Out of the 292 people employed at the facility by Harbert-Yeargin in 1996, only 3 of them were women. All three women testified that they had daily contact with the construction workers, and that none of the male employees, including Davis, ever said anything of a sexual nature to them or touched them inappropriately. Davis himself stated that he would not have touched any female below the belt, and Scott testified that although he had thumped the genitals of another male employee, he would never do that to a woman.

## B.   Trial background

The EEOC filed its action on May 1, 1997, alleging that Dotson, Doyle, and Woods experienced sexual harassment in violation of Title VII. Carlton filed a complaint to intervene on July 31, 1997. The five-day jury trial commenced on April 26, 1999 to adjudicate both the sexual harassment claims of Dotson, Doyle, and Woods, and Carlton's claims of sexual harassment, retaliation, and constructive discharge.

At trial, the EEOC and Carlton presented testimony regarding the workplace environment at the Harbert-Yeargin facility. Their witnesses explained the practice of goosing and how both supervisors and employees either participated in or witnessed the offending conduct. Various employees

reviewed the relevant case law from other circuits. It noted that the circuits were not in agreement on the issue of whether same-sex harassment was actionable, and further there was disagreement as to the type of same-sex conduct that would support an action. The court decided that the majority of circuits would allow predatory homosexual conduct to ground a Title VII claim. The court concluded its opinion, however, by stating:

> It is not necessary for this court to decide today whether same-sex sexual harassment can be actionable *only* when the harasser is a homosexual; all that is necessary for us to observe is that when a male sexually propositions another male *because of sexual attraction*, there can be little question that the behavior is a form of harassment that occurs *because* the propositioned male is a male—that is, "because of . . . sex."

> We think the district court correctly concluded that the plaintiff has made out an actionable claim under Title VII.

*Id.*, at 448 (emphasis in original).

Since the conduct complained of in many of these sexual harassment cases is so offensive, it is easy to understand that a sense of decency initially inclines one to want to grant relief. It is easy to forget, however, that Title VII deals with discrimination in the workplace, not morality or vulgarity. When Title VII was amended to encompass discrimination predicated on sex, the primary focus was on protecting women in the workplace from male supervisors and coworkers treating them differently because of their gender. If the word "gender" had been used instead of "sex," some of the confusion that exists today probably would have never developed. The clock can't be turned back, however, and there is no doubt that the statute protects men as well as women from gender discrimination. It also protects, under certain circumstances, workers from predatory conduct

---

**CONCURRING IN PART, DISSENTING IN PART**

---

RALPH B. GUY, JR., Circuit Judge, concurring in part and dissenting in part.[1]

I concur in that portion of the lead opinion affirming the judgment as a matter of law on the Woods claim. I would, however, reverse the judgment in favor of Carlton.

Although I disagree with the conclusion of the dissent, I cannot say the result reached is a wholly illogical extension of our prior case law. It is an extension, however, and one that goes beyond where I believe the Supreme Court has drawn the line. My view is informed by my reading of the Supreme Court's decision in *Oncale v. Sundowner Offshore Services., Inc.*, 523 U.S. 75 (1998), notwithstanding that this case is also cited by the dissent in support of the decision it reaches.

As the dissenting opinion indicates, this is a same-sex sexual harassment case. The first case in our circuit to definitively state that a same-sex sexual harassment claim is actionable was *Yeary v. Goodwill Industries-Knoxville, Inc.*, 107 F.3d 443 (6th Cir. 1997). Since *Yeary* was decided before *Oncale,* the court did not have the benefit of that decision. Briefly stated, *Yeary* involved a workplace scenario in which the plaintiff was sexually harassed by a homosexual coworker. The harassment consisted of direct propositioning of the plaintiff for sex, a host of obscene and vulgar comments, and a considerable amount of inappropriate and offensive touching. In reaching the decision that this type of conduct was actionable under Title VII, the court first

---

[1] Since Judge Norris has concurred in this opinion, it becomes the opinion of the court with respect to Carlton's claim.

also testified that they had not been made aware of the anti-harassment policies at Harbert-Yeargin. Furthermore, the female employees at Harbert-Yeargin confirmed that they had not been subjected to any unwanted physical contact while working at the facility.

Additional testimony was presented to show that Harbert-Yeargin tried to cover up details about the workplace environment during the EEOC's investigation. In particular, Warren stated that, shortly before he was scheduled to talk to the EEOC investigator conducting the inquiry into Carlton's complaint, he was asked by Bomar and Warren's supervisor, William Irvin, why he was being called in by the EEOC. When Warren explained that the investigator was inquiring about the environment at the facility, Bomar and Irvin told him that "the less you can say when you go in there, the better off we are. You don't have to lie, but you don't have to exactly tell them the truth about everything."

This conversation made Warren fear that he might lose his job. He felt pressured to lie because he had "seen in the past, when people didn't do things that were asked of them, they didn't stay around very long." Accordingly, Warren was not truthful with the EEOC investigator, and signed a document prepared by the EEOC that contained inaccurate information. Warren later testified that he decided to tell the truth when he realized that the matter was actually going to trial.

The jury returned a verdict for Carlton and Woods on their sexual harassment claims, awarding Carlton $1 in compensatory damages and $300,000 in punitive damages, and Woods $1 in compensatory damages and $50,000 in punitive damages. It returned a verdict for Harbert-Yeargin on the sexual harassment claims of Dotson and Doyle. After the jury verdict was entered, the district court set aside the verdict for Woods in response to Harbert-Yeargin's motion for judgment as a matter of law, but let stand the other parts of the jury verdict. The district court also denied Harbert-Yeargin's motion for a new trial with respect to Carlton's

claim. This timely appeal and cross-appeal followed. Although a notice of bankruptcy was filed by Harbert-Yeargin on May 22, 2001, the Bankruptcy Court for the District of Nevada, at the request of all parties, entered an order lifing the automatic stay so that this case could proceed on appeal.

## II. ANALYSIS

### A. Carlton's sexual harassment claim

When reviewing a jury verdict, "[j]udgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999). "[U]nless this Court is left with the definite and firm conviction that a mistake resulting in plain injustice has been committed, or unless the verdict is contrary to all reason, we must affirm the jury's verdict." *Schoonover v. Consol. Freightways Corp. of Del. Local 24*, 147 F.3d 492, 494 (6th Cir. 1998) (internal quotation marks and citation omitted).

#### 1. Whether the alleged harassment was "because of" sex as required under Title VII

Under Title VII of the Civil Rights Act of 1964, "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Harbert-Yeargin argues that the district court erred in denying its motion for judgment as a matter of law because no evidence was presented at trial that Carlton was subjected to any harassment *because of* his sex. Due to this alleged failure, it contends that the EEOC and Carlton failed to show that Harbert-Yeargin violated Title VII.

The Supreme Court, however, held in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998), that "[n]othing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the

---

observations were made at the time of his own harassment. Because the EEOC failed to show that Harbert-Yeargin knew or should have known of Davis's behavior towards Woods, we find no error in the district court's grant of judgment as a matter of law for Harbert-Yeargin with respect to Woods's claim.

## III. CONCLUSION

For all the reasons set forth above, I would AFFIRM the judgment of the district court on both Carlton's and Woods's claims. I would reduce, however, the total amount of damages awarded to Carlton from $300,001 to $300,000 so that the award conforms with the fee cap provided in 42 U.S.C. § 1981a(b)(3)(D).

behavior." But as the district court pointed out, "if this argument were correct, then employers would have constructive notice in every case where there is sexual harassment because, to be actionable, the harassment must be severe or pervasive." Although the EEOC argues that constructive notice can be found with respect to Woods because the "challenged conduct was witnessed by other employees," there was no proof that any of these employees were Harbert-Yeargin supervisors. Woods, for example, was unable to name a single witness who was present when Davis allegedly touched him in the taxi truck.

Nor does *Wanchik v. Great Lakes Health Plan, Inc.*, No. 99-2333, 2001 WL 223742 (6th Cir. Mar. 2, 2001) (unpublished table opinion), supplied as a supplemental citation by the EEOC, render Harber-Yeargin liable for Woods's claim. The EEOC asserts that *Wanchik* stands for the proposition that the pervasiveness of sexual harassment to which a plaintiff is subjected could lead a reasonable jury to conclude that an employer had constructive knowledge of harassment despite the plaintiff's failure to report that harassment.

*Wanchik*, however, is not controlling for two reasons. First, it is unpublished, and therefore only of persuasive value at most. *See* 6th Cir. Rule 28(g). More importantly, even the persuasive value of *Wanchik* is limited, because the certainty of corporate knowledge in *Wanchik* was significantly greater than in the present case. In *Wanchik*, even the CEO and the president of the defendant company admitted to being physically present during the occurrence of, if not participating in, the activities that violated the company's own harassment policy. *See id.* at *11. Woods, on the other hand, failed to provide any evidence that particular supervisors, much less such high-level officers, observed any hostile behavior directed at Woods. Although there was some generalized testimony that Harbert-Yeargin supervisors personally observed a number of coworkers goose other employees, Woods failed to established that these

plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." It pointed out that "[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80. Moreover, as recognized by the majority, Slip Op. at 42, the "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Id.*

The Court then gave two illustrations of situations in which a trier of fact might reasonably find such discrimination. One was where a female victim was harassed by another female in sex-specific terms, and the other was where the alleged harasser treated men and women differently in a mixed-sex workplace. *See id.* at 80-81. "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." *Id.* at 81 (internal quotation marks, brackets, ellipses, and emphasis omitted).

I agree with the majority's statement that "[a]lthough an employer may have some type of general duty, a failure to remedy complaints of sexual harassment that doesn't rise to the level of gender discrimination is not actionable under Title VII." Slip Op. at 40. Contrary to the majority, however, I believe that the EEOC and Carlton presented sufficient evidence for a rational trier of fact to conclude that the sexual harassment did rise to the level of gender discrimination. They presented evidence that the male employees at Harbert-Yeargin were exposed to "disadvantageous conditions of employment" to which the female employees were not, such that the male employees were being discriminated against "because of" sex. In particular, two of the company's supervisors gave testimony that could lead the jury to conclude that males were treated differently from females. One was Davis, who testified that he had never touched a female employee in the breast, buttocks, or pubic area, nor

would he have done so, even though he admitted to touching male employees in the nipples, buttocks, and pubic areas. The other was Scott, who stated that he would never thump the genitals of a woman, although he acknowledged having done so to a male employee.

In addition to the testimony given by these male employees, the testimony of the female employees established that they were never subjected to the inappropriate touching experienced by the male employees. Harbert-Yeargin, in response, points out that there were only three female employees at the facility, and that they worked in the office, not in the field. Although this could be viewed as weighing against the EEOC's claim of discrimination against males, it is not our role to perform such an evaluation. Instead, this court, in reviewing the jury's determination, may only inquire whether a "mistake resulting in plain injustice has been committed, or unless the verdict is contrary to all reason . . ." *Schoonover*, 147 F.3d at 494.

I see no such mistake or unreasonable verdict in the present case. The EEOC and Carlton presented evidence that both men and women were working at the Harbert-Yeargin facility. Indeed, the district court expressly recognized the mixed-sex character of the workplace when it stated that "we're not going to get into whether this was or was not a mixed workplace. I mean, *there were women at the plant*." (Emphasis added.) This language, contrary to the majority's strained interpretation, does not indicate that the "trial judge felt it made no difference whether this was a mixed-sex workplace or not." Slip Op. at 39. Instead, I believe that the judge was simply stating that the presence of women, in addition to all the men, so clearly rendered the facility a mixed-sex workplace that no special jury instructions regarding this matter were necessary.

All of the female employees at Harbert-Yeargin testified that they had never been touched inappropriately and, like the male employees, all of these female employees had daily

one dollar more than allowed by the above fee cap. Although the Supreme Court recently ruled in *Pollard v. E.I. du Pont de Nemours & Co.*, 121 S. Ct. 1946 (2001), that front pay is not an element of compensatory damages within the meaning of the Civil Rights Act of 1991, there is no indication in the record that the one dollar of "compensatory damages" awarded to Carlton was compensation for front pay. The one-dollar compensatory damage award, instead, appears to compensate Carlton for his emotional pain and suffering, and thus falls squarely under the provisions of § 1981a(b)(3)(D). Accordingly, I would reduce to $300,000 the total amount of damages awarded to Carlton so that the award conforms with the fee cap provided in 42 U.S.C. § 1981a(b)(3)(D).

## D.   Woods's sexual harassment claim

Turning now to the EEOC's cross-appeal, it challenges the district court's grant of judgment as a matter of law in favor of Harbert-Yeargin regarding Woods's claim. The district court granted such judgment on the grounds that Davis was not Woods's supervisor and that Woods never voiced a contemporaneous complaint regarding Davis's conduct.

For an employer to be liable for the sexual harassment of an employee by a coworker, the harassed employee must show that the employer both (1) knew or should have known of the harassment and (2) failed to take prompt and appropriate corrective action. *See Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999). The EEOC, however, failed to show that Harbert-Yeargin knew or should have known about Davis's groping of Woods. Unlike the situation with Carlton, it is undisputed that Woods never reported Davis's behavior to the Harbert-Yeargin administration. And Carlton's complaint could not have provided notice to Harbert-Yeargin about Woods's situation, because Carlton voiced his complaint *after* the time that Woods was allegedly groped by Davis.

The EEOC, however, argues that Harbert-Yeargin should be liable to Woods "because Davis had a history of harassing

formulae should not be used in evaluating awards of punitive damages. *See BMW*, 517 U.S. at 582.

Furthermore, the single, isolated case of *Lawyer v. 84 Lumber Co.* does not provide Harbert-Yeargin with a reasonable basis to claim that it lacked fair notice that the punitive damage award in this case could be up to $300,000. A similar award for punitive damages has already been upheld by this court in another Title VII action. *See EEOC v. EMC Corp. of Mass.*, No. 98-1517, 2000 WL 19181 (6th Cir. Feb. 8, 2000) (unpublished table decision) (sustaining a punitive damage award of $300,000 in a Title VII gender discrimination case where the female manager was allegedly terminated for poor performance, but was also forced to work in an environment where she was required to attend district meetings held at a topless bar and forced, at her workplace, to listen to crude jokes regarding women). Given the notice provided by the statutory maximum, as well as the existence of similar levels awarded in other Title VII cases, I would hold that the amount of punitive damages awarded to Carlton is supported by the third part of the *BMW* analysis.

### 3. Statutory cap on compensatory and punitive damages awarded under 42 U.S.C. § 1981a

One additional issue regarding Carlton's claim, not raised by either party, deserves to be briefly addressed. The language of 42 U.S.C. § 1981a(b)(3)(D) provides that

[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed [in the case of a company of Harbert-Yeargin's size] $300,000.

*Id.* In the case before us, the sum of the compensatory and punitive damages awarded by the district court was $300,001,

contact with Davis and the other supervisors. The fact that they worked in the office rather than out in the field does not explain the material difference in treatment. Drawing all inferences in favor of the EEOC and Carlton as the nonmoving parties, as this court must, I believe that a reasonable jury could conclude that the dramatically different experiences of the male and female employees at Harbert-Yeargin established that the employees who were being grabbed or poked in the genitals received this treatment in a discriminatory manner because of their male gender, not simply because the men worked out in the field.

But the majority, despite its denial, *see* Slip Op. at 42, n.6, implies that *Oncale* limits the actionability of Title VII same-sex harassment claims to situations where the "harasser was a homosexual," pointing out that *Oncale* involved a claimant who quit his job because he thought he "would be raped or forced to have sex." Slip Op. at 42. I disagree that *Oncale* imposed such a limitation. The Court presented two illustrations of other situations in which a trier of fact might reasonably find discrimination. *See Oncale*, 523 U.S. at 80-81. Moreover, the Court presented these illustrations as examples, and not as an exhaustive list of all possible situations in which a plaintiff would have an actionable Title VII same-sex harassment claim.

This is not to say that "every 'sexually' hostile work environment will ground a Title VII claim," as the majority asserts. Slip. Op. at 38. Indeed, the Supreme Court set forth "another requirement that prevents Title VII from expanding into a general civility code," *Oncale*, 523 U.S. at 81, when it stated that

[t]he prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the conditions of the victim's employment. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work

environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory conditions of employment.

*Oncale*, 523 U.S. at 81 (internal quotation marks and citations omitted). The majority's fear that "[s]ame-sex sexual harassment cases of this nature present a slippery slope," Slip. Op. at 43, should accordingly be allayed, because the Supreme Court has described how to distinguish between actionable and nonactionable Title VII claims. This is a distinction that I am following here, and thus I respectfully disagree with the majority's characterization of this case as an extension of *Oncale*. *See* Slip Op. at 36.

I perceive that the majority is actually more concerned about the implications of this case than with the jury's verdict on the facts presented. The conduct in question involves far more than mere "towel snapping in the locker room." Slip Op. at 43. Carlton was subjected, on more than one occasion, to invasive physical contact to his genital areas. Davis was able to "stalk" Carlton even after Carlton was transferred, and the other employees were allowed to taunt Carlton by calling him names and subjecting him to obscene physical gestures. And there was ample testimony that other male employees at Harbert-Yeargin were subject to being grabbed, patted, or prodded in the buttocks or genitals, and that females were not subjected to such behavior. *See* Part II.A.2. below for a more detailed discussion regarding the severity and pervasiveness of the work environment at the Harbert-Yeargin facility.

All of this evidence was such that a reasonable jury could conclude that the conditions at Harbert-Yeargin created an "objectively hostile or abusive work environment." Indeed, in addressing the evaluation of the severity of a given

for punitive damages up to the statutory cap," which in part justified the district court's refusal "to reduce the punitive damages below the statutory maximum").

In support of its argument, however, Harbert-Yeargin points to several cases upholding smaller punitive damage awards. But these cases are easily distinguishable. Two of the cases involving lower punitive damage awards, for instance, do not address the upper limit of such awards at all. *See Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 736 (7th Cir. 1998) (upholding a punitive damage award of $2,500 in a sexual harassment case with only $1 in compensatory damages because the company's reprehensible conduct "makes it impossible for us to find that the district court abused its discretion by refusing to grant [the company's] requested remittitur"); *Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir. 1998) (upholding a punitive damage award of $15,000 in a sexual harassment case "because punitive damages are not inconsistent with the lack of compensatory damages"). Another of the cases cited by Harbert-Yeargin involves punitive damages against individual defendants, not a corporation with a $11.8 billion net worth at the time of trial. *See Fall v. Indiana Univ. Bd. of Trustees*, 33 F. Supp. 2d 729 (N.D. Ind. 1998) (ordering a remittitur of punitive damages from $800,000 to $50,000 where the district court imposed punitive damages against individual defendants).

Harbert-Yeargin also cites *Lawyer v. 84 Lumber Co.*, 991 F. Supp. 973 (N.D. Ill. 1997), in which the district court reduced the punitive damage award in a Title VII case from $250,000 to $150,000 simply because $250,000 was five times the compensatory award. The district court specifically based the reduction on its interpretation of the case law within its circuit, stating that "Seventh Circuit cases suggest that punitive damages of three times the level of compensatory damages will be appropriate (or, at least permissible) in many cases." *Id.* at 977. This rationale, however, conflicts with the Supreme Court's admonition that strict mathematical

F.3d 1262, 1273 (10th Cir. 2000) (stating that "where the injury is primarily personal, a greater ratio may be appropriate").

Furthermore, "[i]n determining the amount and effectiveness of exemplary damages to be awarded against a defendant, the court may take into consideration the defendant's wealth or net worth." *Whitney v. Citybank, N.A.*, 782 F.2d 1106, 1119 (2d Cir. 1986). The jury in the present case was made aware that Harbert-Yeargin is part of a global corporation, Raytheon Co., with a net worth of $11.8 billion at the time of the trial. In light of the defendant's net worth, a higher punitive-to-compensatory-damages-award ratio is justified in order to serve Title VII's purpose of punishment and deterrence, because a smaller award would have had much less of an effect on a corporation of Harbert-Yeargin's size. As the trial court stated, "even considering the amount of the fine only, a penalty of $300,000.00 for a corporation worth nearly 12 billion is comparable to a $3,000.00 fine for an individual." Accordingly, I would hold that the amount of punitive damages awarded to Carlton was supported by the second part of the *BMW* analysis.

### c.    *Comparable cases*

Finally, Harbert-Yeargin argues that the size of Carlton's punitive damage award is not supported by awards given in comparable cases. "Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *BMW*, 517 U.S. at 583. For a company of Harbert-Yeargin's size, Title VII's statutory cap provisions allow for the sum of compensatory and punitive damages to reach a maximum of $300,000. *See* 42 U.S.C. § 1981a(b)(3)(D). These provisions put Harbert-Yeargin on notice of the scale of punitive damages that could be awarded for violations of Title VII. *See W&O*, 213 F.3d at 617 (noting that Title VII's statutory cap provisions for punitive damages "put [the defendant company] on notice that it could be liable

harassment claim, the Supreme Court in *Oncale* specifically stated:

> We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads into the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

523 U.S. at 81-82 (internal quotation marks and citations omitted). Examining "all the circumstances," I believe that a reasonable jury could find that the situation at Harbert-Yeargin was such that Carlton had an actionable Title VII claim. The pervasive conduct described above and in Part II.A.2. below went far beyond the sort of actions that might reasonably be expected in the social context of a factory working environment.

The majority finally complains that "[a]lthough the law does not always follow the dictates of common sense, it is hard for me to come to grips with the fact that if Davis had been an equal opportunity gooser, there would be no cause of action here." Yet this is the essence of the Supreme Court's decision in *Oncale*, where it held that "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of

employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80.

I also note that the very hypothetical troubling the majority was recently addressed in *Holman v. Indiana*, 211 F.3d 399 (7th Cir. 2000). *Holman* involved a married couple who worked in the same unit of Indiana's Department of Transportation. They alleged that their common male supervisor sexually harassed them both in violation of Title VII. In dismissing their claim, the Seventh Circuit stated that "Title VII does not cover the 'equal opportunity' or 'bisexual' harasser, then, because such a person is not *discriminating* on the basis of sex." *Id.* at 403 (emphasis in original). To hold otherwise, stated the court, "would change Title VII into a code of workplace civility." *Id.* at 404.

The case before us, however, does not involve an "equal opportunity gooser." Testimony was presented that males were being treated differently from females, and that this negative treatment was severe and pervasive. I would therefore find no "mistake resulting in plain injustice" nor a "verdict [that] is contrary to all reason" that would require reversal of the jury's verdict. *Schoonover*, 147 F.3d at 494.

**2.    *Whether the alleged harassment was sufficiently severe and pervasive to form a valid harassment claim***

Harbert-Yeargin next argues that the district court erred in denying its motion for judgment as a matter of law because the alleged harassment was not sufficiently severe or pervasive to form a valid hostile environment claim under Title VII. It claims that the actions alleged by Carlton to be inappropriate were only "sporadic and isolated," and were not severe enough for a reasonable person to be adversely affected.

In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), the Supreme Court addressed the elements of a valid claim for a hostile workplace environment under Title VII. It held that all

In addition, the management of Harbert-Yeargin told an employee to be evasive during the EEOC's investigation and failed to discipline any employees in response to Carlton's complaints. The supervisors of the facility both condoned and participated in acts similar to those complained of by Carlton. Given all of this, I believe that Harbert-Yeargin's failure to respond more appropriately to Carlton's harassment evinced a degree of reprehensibility sufficient to support an award of punitive damages to Carlton.

**b.    *Ratio to actual damages***

Harbert-Yeargin next argues that the $300,000 punitive damage award was unreasonable because the jury determined that Carlton's compensatory damages merited only $1. In *BMW*, however, the Supreme Court expressly pointed out that low compensatory damages does not preclude a large punitive damage award "if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which . . . the monetary value of the noneconomic harm might have been difficult to determine." *Id.* at 582. The essence of this guidepost is to "require[] a court to ask whether a relatively higher ratio of punitive to compensatory damages is permissible in order to effect the deterrent purposes behind punitive damages." *W&O*, 213 F.3d at 616.

A large punitive-to-compensatory-damages-award ratio is justified in the case before us in order to support the deterrent purpose of Title VII. As pointed out in Carlton's brief, he suffered a "physical assault for which no punishment was meted out. In addition, he was subjected to continuous harassment that supervisors encouraged or condoned." Although the economically compensable value of Carlton's injuries might have been small, the egregiousness of the acts suffered by Carlton — unwanted physical intrusion in his genital area — was great enough to support a much higher ratio so as to ensure that such conduct does not occur in the future. *See Deters v. Equifax Credit Info. Servs., Inc.*, 202

economic injury of only $4,000); *but see EEOC v. W&O, Inc.*, 213 F.3d 600, 614-17 (11th Cir. 2000) (applying the factors outlined in *BMW* and upholding a punitive damage award in a Title VII action that had already been reduced to the statutory cap as not excessive). "[C]ourts of appeals should apply a de novo standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 121 S. Ct. 1678, 1685-86 (May 14, 2001).

In *BMW*, the Supreme Court set forth three guideposts to determine whether an award of punitive damages is so excessive as to violate a defendant's due process rights. These guideposts are (1) the "degree of reprehensibility" of the wrongdoing, (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and [his] punitive damages award," and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *BMW*, 517 U.S. at 575. An analysis of these three guideposts as applied to the amount of the punitive-damages award in the present case follows.

### a.    *Degree of reprehensibility*

In examining the degree of reprehensibility of a defendant's conduct, the Supreme Court outlined a number of "aggravating factors," including whether the harm was more than "purely economic in nature," and whether the defendant's behavior "evinced . . . indifference to or reckless disregard for the health and safety of others." *Id.* at 576. Here, the harm to Carlton was more than purely economic. He suffered unwanted physical contact to his genitals and buttocks, causing him to feel "violated," "outraged," and both mentally and physically drained. After he reported being harassed, he was not only stalked by Davis, but was also mocked and humiliated by his coworkers. These circumstances are sufficient to demonstrate the reprehensibility of the conduct for which Harbert-Yeargin is being held responsible. *See id.* at 575 n.24.

of the circumstances relating to the plaintiff's workplace environment must be taken into account. *See id.* at 23. These circumstances "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," as well as its "effect on the employee's psychological well-being." *Id.* Furthermore, the conduct must both create an "objectively hostile or abusive work environment" and cause the victim to *"subjectively perceive the environment to be abusive." Id.* at 21-22.

Based on my review of the record, I believe that sufficient evidence was presented for a jury to reasonably determine that Carlton's workplace environment was hostile and abusive under both the objective and subjective standards of *Harris*. First, the evidence demonstrated that the discriminatory conduct occurred quite often. Carlton testified that Davis attempted to get close to him on a daily basis, and that whenever Davis talked to him, he "had to be touching [him]." He also testified that after he reported Davis's behavior to Bomar, Davis began to stalk him "two or three times a day," and that his coworkers began mocking him without correction by Harbert-Yeargin supervisors. Finally, other employees, such as Dotson and Doyle, testified that the practice of goosing occurred every day among male employees at Harbert-Yeargin, and that supervisors both condoned and engaged in the offensive conduct.

Harbert-Yeargin, however, argues that Carlton's harassment was infrequent, pointing out that Carlton identified only two instances where his genitals were grabbed. But "the totality-of-the-circumstances test mandates that district courts consider harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment." *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). Accordingly, a jury could consider the frequency of other instances of hostile conduct and reasonably find, "keeping in

mind that each successive episode has its predecessors, that the impact of the separate incidents may [have] accumulate[d], and that the work environment created thereby may exceed the sum of the individual episodes." *Id.* at 563; *see also id.* at 561 (rejecting the district court's determination that the complained-of conduct was "infrequent, not severe, not threatening or humiliating, but merely offensive" where, to support her claim of a hostile work environment, a female plaintiff presented fifteen separate allegations of persistent foul language and sexually explicit comments directed at her, offensive comments towards women in general, and denial of her requests for overtime work).

The evidence also showed that the offending conduct was both physically threatening and humiliating. Carlton testified that the threatening nature of the first instance when Davis grabbed his genitals was enhanced by the fact that Davis sent away the only other person on the scene, thus isolating Carlton from any help. During the second episode, Davis's contact was even more extensive, with his finger running from Carlton's genitals, over his anus, and to his back. The jury could have reasonably considered both of these instances as evidence that Carlton was subjected to severe, physically threatening, and humiliating discriminatory conduct.

Moreover, the jury could have reasonably found that the other adverse behavior to which Carlton testified was physically threatening or humiliating. Davis's stalking of Carlton after Carlton reported Davis's misconduct could have been construed by a reasonably jury as physically threatening behavior. *See Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 784 & n.3 (10th Cir. 1995) (stating that "threatening stares" could constitute further evidence to support a plaintiff's hostile work environment claim when the stares were apparently made in retaliation for the plaintiff's complaints about sexual harassment). And the fact that Carlson's coworkers "hunch[ed] on each other," called him "Louie's girlfriend," and treated him like "the plague" every

Harbert-Yeargin did not shield the company from punitive damages. "While an employer's institution of a written policy against [] discrimination may go a long way toward dispelling any claim about the employer's reckless or malicious state of mind . . . such a policy is not automatically a bar to the imposition of punitive damages." *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 446 (4th Cir. 2000) (finding that the defendant's "commitment to a company-wide policy against racial discrimination in the workplace is called into question" where two of its top executives held racially discriminatory attitudes and where one of the executives implemented a promotional system having the capacity to mask racial discrimination).

There was also ample evidence for a reasonable jury to infer that Harbert-Yeargin's anti-sexual harassment policy was one in name only. Various employees testified that they received no anti-harassment training, even though the company's official procedures required such training. Davis was never disciplined for his inappropriate touching of Carlton. The company failed to investigate Carlton's later complaints that Davis was stalking him and that his coworkers were mocking him for filing a complaint in the first place. And numerous witnesses testified that inappropriate genital-grabbing was occurring throughout the Harbert-Yeargin facility, both by and in the presence of supervisory personnel, and that no one was ever disciplined for this behavior. Given all of this proof, I believe that there was more than sufficient evidence to support a finding of punitive damages against Harbert-Yeargin.

### 2.   *Challenge to the amount of the award as excessive*

Harbert-Yeargin next argues that the award of $300,000 in punitive damages was so excessive as to violate its constitutional right to the due process of law. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) (holding that a punitive award of $2,000,000 violated the Fourteenth Amendment in a case where BMW was found liable for

infer that Harbert-Yeargin was aware of the risk that such eyewitnesses would confirm that it was violating Carlton's Title VII rights.

Harbert-Yeargin's failure to exact any discipline for the offending conduct provides additional evidence supporting Carlton's claim for punitive damages. Scott, the site superintendent who was responsible for enforcing the company's anti-sexual harassment policy, failed to discipline Davis for his actions, despite testifying that he believed Carlton's complaints about being harassed by Davis. Nor were any of the coworkers who later teased Carlton for reporting the incident ever disciplined for their conduct. I believe that a reasonable jury could have inferred reckless indifference from Harbert-Yeargin's failure to respond to these situations. *See Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1269 (10th Cir. 2000) ("[R]ecklessness and malice are to be inferred when a manager responsible for setting or enforcing policy in the area of discrimination does not respond to complaints, despite knowledge of serious harassment.").

The jury could also have inferred malice in the form of retaliation when Davis, at the direction of Bomar, documented an alleged "welding problem" by Carlton, given that this documentation was not done according to company policy. And because this documentation occurred after Carlton first complained about Davis, "it was not irrational or impermissible for the jury to infer" that this action was intended "to disguise the retaliatory nature of their action from outsiders." *Vasbinder v. Ambach*, 926 F.2d 1333, 1343 (2d Cir. 1991) (holding, in an unlawful discharge action, that a reasonable jury could have awarded punitive damages where the defendants took affirmative steps against the plaintiff, including "fill[ing the plaintiff's] record with damaging personnel actions").

Finally, the jury had sufficient evidence to conclude that the existence of a written anti-sexual harassment policy at

time they saw him could have been reasonably interpreted by the jury as evidence that Carlton was subjected to humiliation.

Finally, there was more than sufficient testimony presented at trial to show that the workplace environment at Harbert-Yeargin unreasonably interfered with Carlton's work performance and had a significantly negative effect on his psychological well-being. Carlton was "ashamed" and "almost sick" about the incidents. He testified that Davis's behavior made it difficult for him to concentrate on his welding, to the point where he "couldn't do nothing, really." After he reported Davis's misconduct, he felt both physically and mentally drained by the actions of Davis and his coworkers. Given all of this testimony, I believe that the jury had ample facts to reasonably conclude that Carlton was subjected to a hostile work environment that was severe and pervasive.

### 3. Whether Harbert-Yeargin's response was so inadequate and ineffective as to render the company liable

In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court held that where a supervisor harasses an employee, but takes no tangible employment action against him, the employer is still liable unless the employer affirmatively shows that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that the plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc.*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

Harbert-Yeargin argues that it fulfilled both elements of its affirmative defense. The company claims that it exercised reasonable care to protect Carlton from harassing behavior by immediately transferring him to another crew after he

reported Davis's misconduct, holding a meeting to tell his coworkers that there was to be no more "horseplay," and conducting an investigation of Carlton's complaint. Harbert-Yeargin also notes that the anti-sexual harassment policy it had in place explicitly made alternate avenues of complaint available by stating that "[a]ny employee that feels he or she has suffered sexual harassment should report such incidents to his or her immediate supervisor, the Site Manager, or the Home Office Human Resources Department without, [sic] fear of reprisal." Finally, Harbert-Yeargin charges that Carlton failed to take advantage of the policy by not reporting the first incident, and failed to take advantage of the preventative opportunities available to him after the second incident by refusing to talk to Cooper without his attorney present.

In reviewing a motion for judgment as a matter of law, however, "we do not weigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the jury." *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 825 (6th Cir. 1997). We instead look at the evidence in the light most favorable to the nonmoving party and decide if it was sufficient to raise a genuine issue of material fact for the jury. *See Ratliff v. Wellington Exempted Vill. Sch. Bd. of Ed.*, 820 F.2d 792, 795 (6th Cir. 1987). Here, the jury had abundant evidence to conclude that Harbert-Yeargin failed to exercise reasonable care to protect Carlton from harassment.

Although Harbert-Yeargin points out that it had an anti-sexual-harassment policy in place to address Carlton's problems, a reasonable jury could have concluded from the evidence that this policy was not enforced in practice. Several employees testified that they were unaware that the policy even existed. Scott, the site superintendent, acknowledged that he had received no anti-harassment training, despite the fact that such training was mandated by corporate policy. Other witnesses testified that goosing was a frequent occurrence at the facility, but that no one was ever disciplined, even when supervisors witnessed the practice.

awareness that it is engaging in discrimination, but to its knowledge that it may be acting in violation of federal law." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 527 (1999). In the present case, Harbert-Yeargin argues that it could not have been aware that it acted in violation of federal law because, at the time of the alleged harassment, the case of *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) (recognizing that Title VII applies to same-sex harassment), had not yet been decided.

Since the 1970s, however, there have been cases holding that Title VII can be violated by members of the same race or sex as the victim of discrimination. *See id.* at 78 (citing Supreme Court decisions from 1977 and 1987 to support its express recognition of same-sex harassment). *Kolstad*, moreover, does not require that an employer know for sure that it acted in violation of federal law in order to be liable for punitive damages under Title VII. Instead, *Kolstad* holds that punitive damages are warranted when the employer engages in conduct that carries with it a "*perceived risk* that its actions will violate federal law." *Kolstad*, 527 U.S. at 536 (emphasis added).

Here, the jury could reasonably infer from Harbert-Yeargin's actions that it perceived the risk that its actions violated federal law. There was testimony at trial that Bomar and Irvin, as supervisory personnel of Harbert-Yeargin, specifically directed Warren to be less than truthful in an interview with an EEOC investigator about the facility's workplace environment. Warren also testified that he felt pressured by Bomar and Irvin to sign a document prepared by the EEOC that contained inaccurate information, rather than correct that information. *See Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (including, in a description of conduct sufficient to warrant a finding of a high degree of reprehensibility, "whether a defendant acted with deceit or malice as opposed to acting with mere negligence"). Moreover, Cooper's failure to seek potential eyewitnesses to corroborate Carlton's allegations could have led the jury to

that the EEOC would be introducing additional evidence of inappropriate touching.

I agree. All of the witnesses were known to and deposed by Harbert-Yeargin before the end of the discovery period, which was more than 15 days before trial. Harbert-Yeargin, in turn, was aware that the EEOC and Carlton were alleging a hostile workplace environment, which necessarily included a challenge to more than the acts of Davis towards Carlton. As such, the district court did not abuse its discretion in denying Harbert-Yeargin's motion for a new trial with regard to Carlton's claim. *See Greenwell v. Boatwright*, 184 F.3d 492, 499 (6th Cir. 1999) (reviewing the district court's denial of a motion for a new trial for abuse of discretion).

## C.    Punitive damage award

Harbert-Yeargin also claims that the jury's punitive damage award to Carlton should be vacated because it was both against the weight of the evidence and excessive in amount. Both claims are addressed below. I also address the fact that the sum of the punitive and compensatory damage award exceeded the statutory cap by one dollar, a minor point not raised by either party.

### 1.    *Challenge to the evidence in support of the punitive damage award*

A jury may award punitive damages in a Title VII claim "if the complaining party demonstrates that the respondent engaged in a discriminatory practice . . . with malice or with reckless indifference to [his] federally protected rights." 42 U.S.C. § 1981a(b)(1). Under this standard, Harbert-Yeargin must show that there was insufficient evidence to raise a genuine issue of material fact regarding the question of whether it created a hostile workplace environment "with malice or reckless indifference."

The Supreme Court has determined "[t]he terms 'malice' and 'reckless indifference' pertain not to the employer's

A reasonable jury could also have concluded from the evidence that Harbert-Yeargin failed to exercise reasonable care to protect Carlton from further harassment. *See Jackson v. Quantex Corp.*, 191 F.3d 647, 663-64 (6th Cir. 1999) (holding that the defendant failed to satisfy its "burden of proving that its action was a reasonable attempt to prevent and correct the problem of racially harassing behavior"). The jury could have concluded from Harbert-Yeargin's refusal to talk to Carlton in the presence of his attorney that the company failed to take actions reasonably calculated to end Davis's misconduct, because without talking to Carlton or, indeed, to anyone else who witnessed the offending actions, Harbert-Yeargin could not adequately assess the extent of the misconduct.

Moreover, Harbert-Yeargin failed to discipline Davis for his behavior, despite the fact that it immediately transferred Carlton to another crew once Carlton reported Davis's misconduct. A reasonable jury could have concluded that by failing to discipline Davis, Harbert-Yeargin's actions were not reasonably calculated to end Davis's harassing behavior. *See Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1242 (10th Cir. 1999) (pointing out that an investigation conducted by the employer after the employee reported an instance of harassment "could reasonably be regarded as a sham, especially where no [] employee was ever disciplined, even minimally").

In addition, Davis was still able to "stalk" Carlton even after Carlton was transferred, and other employees were allowed to taunt Carlton by repeatedly grabbing and "hunch[ing]" on each other, by calling Carlton "Louie's girlfriend," and by treating him like he had "the plague." A reasonable jury could have concluded that these continuing instances of harassment supported Carlton's claim that Harbert-Yeargin took no action reasonably calculated to end his harassment. *See Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1258 (6th Cir. 1985) (holding that the "jury's finding of intentional discrimination . . . is supported by

substantial evidence" where the "[m]anagement was aware of plaintiff's many complaints of harassment and condoned the situation by taking no steps to improve conditions and by seeking to intimidate plaintiff").

The jury was also presented evidence from which it could infer that Carlton did not unreasonably fail to take advantage of any preventative or corrective opportunities provided by Harbert-Yeargin. Although Carlton did not complain the first time that Davis grabbed his genitals, a reasonable jury could have concluded that Carlton had rational grounds to refrain from reporting this incident because he was new to the company, had no witnesses, and the harasser was his supervisor. *See Williams v. General Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999) (stating that "reluctance to report the [harassing] incidents is entirely understandable considering that one of the alleged aggressors was her supervisor and she wanted to get along at work"). Furthermore, Carlton complained immediately after the second occasion when Davis grabbed his genitals, accepted the transfer that was offered to him after he complained, and attempted to avoid contact with Davis after Davis began stalking him.

A reasonable jury could also have concluded that Carlton's failure to participate in Harbert-Yeargin's investigation without his attorney present did not constitute an unreasonable failure to take advantage of any corrective opportunities offered by Harbert-Yeargin. In light of Harbert-Yeargin's failure to interview Lindley, who had witnessed the second incident, the jury could have concluded that Carlton's reluctance to be interviewed alone was understandable.

Given all of this evidence, I believe that the jury had sufficient grounds to infer that Harbert-Yeargin failed to exercise reasonable care to prevent and promptly correct the harassment faced by Carlton. It also had a basis to conclude that Carlton did not unreasonably fail to take advantage of any preventative or corrective opportunities provided by Harbert-Yeargin.

**B.   Admission of additional testimony**

Harbert-Yeargin also challenges the district court's admission of testimony regarding previous incidents in which Davis and others inappropriately touched employees at the Jackson, Tennessee facility. This testimony, argues Harbert-Yeargin, constitutes grounds for a new trial. The crux of Harbert-Yeargin's objection is that Rule 415 of the Federal Rules of Evidence required the EEOC to disclose its intent to offer such testimony at least 15 days before the scheduled date of trial. In claims for damages "predicated on a party's alleged commission of conduct constituting an offense of sexual assault," Rule 415 governs the admission of "that party's commission of another offense or offenses of sexual assault." *Id.* Harbert-Yeargin claims that it is entitled to a new trial because the EEOC did not give it the proper advance notice as required by this Rule.

The EEOC, however, argues that it did disclose its intent to offer testimony about inappropriate touching by Davis and other employees much earlier than 15 days before the trial. At least two years before the trial, the EEOC gave Harbert-Yeargin notice that it was challenging more than the acts of Davis when it informed the company, in the EEOC's September 30, 1996 letter of determination, that its investigation "revealed that the Charging Party was sexually harassed by his male supervisor and that [the practice] was pervasive for *males* to touch other *males* at the worksite." (Emphasis added.).

In addition, the EEOC points out that its complaint alleged that Harbert-Yeargin was "subjecting Carlton and a class of male employee [sic] to sexual harassment, including offensive and unwelcome touching because of sex (male)." Finally, the EEOC argues that "Harbert-Yeargin knew the identity of all the witnesses who would testify at trial well before the trial date, and had deposed all of them." The EEOC argues that these factors were sufficient to comply with Rule 415's requirement that Harbert-Yeargin be given advance notice