**Charles L. ENGLISH, Plaintiff,**

v.

**POHANKA OF CHANTILLY, INC.**
**d/b/a Pohanka Lexus, et al.,**
**Defendants.**

**No. Civ.A. 01–771–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 20, 2002.

John C. Cook, Allred, Bacon, Halfill & Young, Farifax, VA, for Plaintiff.

Scott A. Mills, Troutman, Sanders, Mays & Valentine, McLean, VA, Charles A. Hawkins, Troutman, Sanders, Atlanta, GA, for Defendants.

### *AMENDED MEMORANDUM ORDER*

LEE, District Judge.

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment on Plaintiff's Title VII hostile environment claim. The issue presented is whether Plaintiff raises a genuine issue of material fact as to whether the alleged same-sex co-worker harassment at issue in this case was "because of sex."[1] On December 11, 2001, this Court granted Defendants' summary judgment motion in a preliminary order. The December 11th Order indicated that the Court would later release a substantive memorandum order explaining the merits of the decision and that the period for appeal would be tolled until release of the subsequent memorandum order.

For the reasons discussed below, the Court holds that Plaintiff's Title VII claim cannot withstand summary judgment because Plaintiff fails to raise a genuine issue of fact demonstrating that his co-worker Joseph Dutchburn's alleged harassment was "because of sex," an essential element in a Title VII hostile environment sexual harassment claim. Plaintiff has produced considerable evidence that Dutchburn directed many unwelcome sexually tinged remarks and acts toward Plaintiff and others in the workplace. However, when considered in the proper context, it cannot be

---

1. Defendants also seek summary judgment, on three other grounds. First, Defendants move for summary judgment on Plaintiff's constructive discharge claim under Title VII. Second, Defendants seek summary judgment in favor of individual corporate Defendant "Pohanka Automotive Group" because Pohanka Automotive Group is allegedly not a legal entity and did not employ the Plaintiff. Third, Defendants seek summary judgment on Plaintiff's claim for punitive damages. Because the single issue of "because of sex" under Plaintiff's Title VII claim is dispositive of the entire case, the Court will not address the remaining issues in this opinion.

reasonably inferred from the evidence before the Court that the harassment the Plaintiff complains of was discrimination because of his sex. Although the Court does not condone Dutchburn's obnoxious behavior, such conduct does not constitute discrimination because of sex. Title VII is not a morality code prescribing a wide range of harassment. The conduct must be discrimination motivated by the victim's gender, not the harasser's desire to humiliate or tease the Plaintiff. Because the record demonstrates that this case falls into the latter, the Court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's Title VII claim.

## I. BACKGROUND

Plaintiff Charles L. English's employment as a new car sales consultant with Defendant, Pohanka of Chantilly, Inc., d/b/a Pohanka Lexus, began on August 8, 1998. Defendant Pohanka Lexus is a new and used car dealership. The dealership's office space or showroom is divided into the new car sales consultants sharing space on one side of the dealership and the used car sales consultants sharing office space on the other. The sales showroom is an open area, employing cubicles with half-walls as offices for the sales consultants. English shared his cubicle with Augustine Iduma. (Pl.'s Mem. in Opp'n Ex. J, Augustine Iduma Aff. ¶ 1 ("Iduma Aff.")). The acoustics of the showroom created an "echo chamber" where conversations between co-workers could be easily overheard. (Def.'s Mem. in Support of Summ.J.Ex. 26, Scott Brewer Aff. ¶ 13; Ex. 27, Eric Schulthics Aff. ¶ 2).

The record indicates that at the time of English's employment, the new and used car consultants were all male.[2] It appears that there were only two female employees at the dealership—the used car manager Ms. Cathy Newell and the receptionist, Ms. La Reine Parham. Ms. Newell's office was located in a separate location between the new and used car showroom areas. (Def.'s Mem.Ex. 22, C. Newell Aff. ¶ 3 ("Newell Aff.")). The receptionist desk of Ms. Parham, and the office of English's manager James Serone, were also separate from the used car and new car office areas. (Def.'s Mem.Ex. 29, Parham Aff. ¶ 2; Pl.'s Mem.Ex. I, Serone Dep. at 11 ("Serone Dep.")).

The alleged harasser in this case, Joseph Dutchburn, was a used car consultant. Prior to English joining Pohanka, Dutchburn was well known among his co-workers for lewd comments and annoying behavior. (Newell Aff. ¶ 3; Def.'s Mem.Ex. 31, J. Brown Aff. ¶ 2 ("Brown Aff.")). see also Pl.'s Mem.Ex. K, M. Ryan Aff. ¶¶ 3–5 ("Ryan Aff."). For instance, Dutchburn's manager Ms. Newell stated that Dutchburn "got on just about everyone's nerves ... [and] was also a 'touchy feely' person ...." (Newell Aff. ¶ 3). Dutchburn frequently discussed his girlfriends around the office. (See, e.g., Pl.'s Mem. Iduma Aff. ¶ 2). Although his co-workers considered Dutchburn's behavior annoying, they did not find his antics unmanageable. (See Newell Aff. ¶ 3; Ryan Aff. ¶ 4; Brown ¶ 2). Many of the sales consultants "talked and joked among themselves about Dutchburn's behavior." (Ryan Aff. ¶ 5). Whenever Dutchburn directed his behavior to-

2. The Court bases this finding on the affidavits, letters and reports gathered by the Fairfax County Human Right Commission ("HRC") in connection with the investigation of English's HRC complaint. (See Def.'s Mem.Exs. 4–8, 10–11, 20–31). In particular, the Defendants submit affidavits compiled by the HRC from twelve of English's fellow employees, including Augustine Iduma, James Serone, Daniel Kinser, Cathy Newell, Mickey Whitehead, Mike Ryan, Scot Brewer, Eric Schulthics, La Peine Parham, Garry Whipkey, Seth Dryer and Joseph Brown.

ward his co-workers, they simply asked him to stop and Dutchburn would cease the unwelcome behavior. For example, sales consultant Michael Ryan states that after Dutchburn touched him on the shoulder, Ryan asked him to stop and Dutchburn complied. (*See id.* ¶ 3). Similarly, if Dutchburn "got in his face," Joseph Brown would ask him to stop and Dutchburn would desist. (Brown Aff. ¶ 2).

At first, English also thought that Dutchburn's conduct was a joke. (Pl.'s Mem.Ex. A, Charles English Dep. at 62 ("English Dep."); Pl.'s Mem.Ex. B, English Chronology ("English Chronology")). Judging from English's deposition testimony, it appears that up until August 17, 1998, English considered Dutchburn to be "just joking around." (English Dep. at 62). English also initially believed that the first comment he complains of was also a joke. (*See id.* at 74–76). Dutchburn's initial comment to English was that he "wanted to plant his salami between [English's] cheeks," while walking behind English. (*Id.* at 74–75). English believed that Dutchburn's "salami" comment was a joke. (*See* English Dep. at 75 (stating that "usually guys don't say that unless it's a joke.") and at 76 ("Yes. I thought—I thought it was just a joke.")). Augustine Iduma, the fellow sales consultant sharing office space with English, sheds some light on the comment. Iduma's affidavit, which is included in both parties' pleadings, states that Dutchburn frequently commented that "he wanted to plant his salami between someone's cheeks." (Iduma Aff. ¶ 3). According to Iduma, Dutchburn never directed the comment to anyone in particular. (*Id.*) [3]

Beginning on August 17, 1998, Dutchburn began a daily, albeit brief, campaign of lewd behavior directed at English. (English Dep. at 76). First, Dutchburn walked up behind English, wrapped his arms around English and said "I'm going [to lunch] with you." (English Chronology; *see also* Iduma Aff. ¶ 3). At lunch, Dutchburn and English discussed Dutchburn's apartment and his various girlfriends. Dutchburn asked English about his home life and intimate sexual relations with his wife. (English Dep. at 144–145). English testified that Dutchburn's questions at lunch about his intimate sexual relations with his wife and home life made him uncomfortable. (*Id.*)

Later that day, Dutchburn told English that "they needed to bond." Shortly thereafter, Dutchburn approached English from behind while English was seated at his desk and pressed his genitals against English's shoulders. (*See* English Chronology). English told Dutchburn to stop and Dutchburn repeated the action. Meanwhile, Serone approached English laughing at Dutchburn's behavior. (English Dep. at 86–87). English did not consider Dutchburn's contact a sexual assault. (*Id.* at 149–50). Iduma states that he observed Dutchburn rub his genitals against English's shoulders on other occasions, as well as rub English's back. (Iduma Aff. ¶ 3).[4] Later that day, another co-worker told English that "Harry somebody called for you." (English Chronology). English asked "Harry who?" and the co-worker responded "Harry Vagina." (*Id.*) The co-worker stated that Dutchburn had asked him to play the prank on English. (*Id.*)

---

**3.** Additionally, Iduma's affidavit states that after observing Dutchburn's vulgar conduct toward English, Iduma advised English that English should report Dutchburn to management. Iduma states management and that Iduma should not get involved in the matter. (*See id.*)

**4.** On a separate occasion, Iduma states that he overheard Dutchburn comment on an employee—"What do you think. How big do you think his dick is?" (Iduma Aff. ¶ 9).

The next day, Dutchburn approached English and said "Hi Chuckles" and hit English on his behind while English was standing at the front desk. (*Id.*) English ignored him. Later that day, Dutchburn returned to English's office space and asked him if he wanted to bond. English called Dutchburn a "wacko," to which Dutchburn retorted "I love you," winked and then added "like a step son." (*Id.*) Dutchburn then asked English "if he'd like to put his meatballs on [English's desk]." (English Chronology). In response, English left his desk. On August 19, 1998, Dutchburn asked English whether he was angry with him. (*Id.*) In the afternoon, Dutchburn approached English from behind, stuck his finger in English's side and said "next time it would be [my] 9MM." (*Id.*)

Finally, on August 20, 1998, Dutchburn commented to English that he did not look happy. English did not answer. Dutchburn then asked "didn't your wife give you any, I don't think so, [sic] Maybe I should call her." (*Id.*) English responded that Dutchburn was "nuts." Dutchburn then pointed to his shoulder and said "why don't you put your head right here ... I'll make you feel better. Are you still mad at me?" (*Id.*) Dutchburn asked English to go for a walk so they could "smoke the peace pipes," looked down at his lap and said, "you know, the bones." (*Id.*)

Meanwhile, English states that he complained to management on several occasions of Dutchburn's conduct. According to English, on August 17, 1998, he informed his supervisor Serone that Dutchburn's behavior and offensive comments were unwelcome and that English wanted Serone to restrain Dutchburn. (English Dep. at 85–90, 108). As discussed above, Serone observed one of the unwelcome touching incidents. When English gestured to Serone that English thought Dutchburn's behavior was unwelcome, Serone laughed and told English "you're just going to have to tell him [Dutchburn] to back off, big guy." (*Id.*) On August 18, 1998, English told Serone that Dutchburn had stated to English that Dutchburn "loved him," that Dutchburn was constantly smacking English on the behind, that Dutchburn would rub his finger across English's back when he walked by and touch English on his shoulder. English also told Serone that English suspected that Dutchburn was gay. (English Dep. at 87–90). English does not allege that Dutchburn ever told English that Dutchburn was a homosexual or that Dutchburn had any reason to believe that English was homosexual.

Serone recalls that English spoke with him on two occasions about Dutchburn. Serone remembers that English complained about Dutchburn touching English on the shoulder and standing too close to English. (Serone Dep. at 9–12; *see also* Serone Aff. ¶¶ 3–5). Serone also recalls English telling him that Dutchburn was "weird." Serone did not take any action against Dutchburn in response to English's statements because he did not consider English's comments to be complaints about sexual harassment. (Serone Dep. at 12–18).[5] Serone testified that English told him not to intervene with Dutchburn. (Serone Dep. at 12–17).

According to English, Dutchburn's behavior caused English to begin to experi-

---

**5.** Pohanka has a "No Harassment Policy" set forth in the Pohanka employee's handbook that directs employees to report sexual harassment complaints. (Pl.'s Mem.Ex. H). English signed a statement acknowledging the policy. (Def.'s Mem.Ex. 1, "No Harassment Policy"). English contends that his oral reports to Serone were sufficient to invoke Pohanka's complaints process. Defendants on the other hand argue that English's reports to Serone were not "complaints" of sexual harassment.

ence health problems. English suffered chest pains and an anxiety attack. English's physician opined that English's anxiety attack was caused by Dutchburn's offensive conduct. (Pl.'s Mem. at 5, Exs. D and E). On or about August 26, 1998, English was admitted to the hospital for treatment.

Prior to admittance to the hospital, English had contacted the Fairfax County Human Rights Commission ("HRC") to complain about Dutchburn's conduct. English filed a charge of sexual discrimination with the HRC on September 1, 1998 and a formal complaint based on English's charge was filed on September 2, 1998.[6] September 2, 1998 was also the day English returned to work. Upon seeing Dutchburn, English became ill. Later that day, English resigned his position with Pohanka. English told Serone that he resigned due to his health. Pohanka's failure to prevent Dutchburn from harassing him was causing him too much stress. (English Dep. at 148–49). English's Exit Report, dated September 8, 1998, states that English had left after a few weeks because of a heart attack. (Pl.'s Mem.Ex. W).

On November 7, 2001, English filed a two count complaint alleging a hostile work environment sexual discrimination claim and a constructive termination claim under Title VII in Fairfax County Circuit Court. English's complaint was subsequently removed to this Court on May 16, 2001. Defendants filed a motion for summary judgment on all of English's claims.

On December 11, 2001, this Court granted Defendants' motion stating that a memorandum order explaining the Court's reasoning for granting summary judgment would be forthcoming.

■ For the reasons set forth below, Defendants' motion for summary judgment on English's Title VII claim is granted because English does not provide sufficient evidence to satisfy the essential element of "because of sex." Because the Court grants summary judgment on English's Title VII sexual discrimination claim, English *a fortiori* cannot show that his working conditions were of such an intolerable nature that they constituted a constructive discharge under Title VII. *See Taylor v. Virginia Union University,* 193 F.3d 219, 237 (4th Cir.1999), *cert. denied,* 528 U.S. 1189, 120 S.Ct. 1243, 146 L.Ed.2d 101 (2000). Therefore, summary judgment on English's constructive discharge claim is granted as well.

## II. ANALYSIS

### A. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment will be granted if it is shown that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once a motion for summary judgment is properly made and

6. Beginning in February 1999, English filed several supplements and amended complaints to the HRC. (*See* Defs.' Exs. 4, 9, 10, 11, and 12). After interviewing twelve of the seventeen employees who worked at Pohanka during English's employment, HRC issued a letter to English requesting more information by June 29, 2000, concerning Pohanka's representations that English had not used the company's "no harassment policy" and proce-

dures. (Defs.' Mem.Ex. 13). On August 8, 2000, a representative of the HRC informed English that there was insufficient evidence to support English's claim. (Defs.' Mem.Ex. 20, HRC Log at 11). Meanwhile, on April 11, 2000, English filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). The EEOC later issued English a "right-to-sue" letter.

supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *See id.* The moving party is entitled to judgment as a matter of law unless a fair-minded jury could return a verdict for the nonmoving party on the evidence presented. *See id.* at 247–48, 106 S.Ct. 2505. In order to successfully oppose a motion for summary judgment, the nonmoving party is required to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

## B. Sex Discrimination Based on Hostile Work Environment.

■ Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees based on gender regarding terms, conditions, or privileges of employment. 42 U.S.C. § 2000e–2(a)(1) (2001). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted).

■ To succeed on a claim of hostile work environment under Title VII, the plaintiff must prove by a preponderance of the evidence that (1) the harassment was because of sex, (2) the harassment was unwelcome, (3) the harassment was sufficiently severe or pervasive to alter the plaintiff's conditions of employment to create an abusive working environment, and (4) some basis exists for imputing liability to the employer. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir.2000). All of the elements must be aggregated and objectively considered within the context the incidents and/or comments are made. *See Harris*, 510 U.S. at 21–23, 114 S.Ct. 367.

## C. Discrimination "Because of Sex."

■ The Court first turns to the threshold "because of sex" prong. Whether the "because of sex" factor is met depends in part upon the nature of the conduct involved and the context of the behavior. *See Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir.2000). There is a significant distinction between harassment that is sexual in content and harassment that is sexually motivated, and Title VII is only concerned with the latter. *See Oncale*, 523 U.S. at 80, 118 S.Ct. 998. In the case of same-sex sexual workplace harassment, the plaintiff must demonstrate that the harassing conduct was not merely "tinged with offensive sexual connotations," but actually constituted discrimination because of sex. *Id.* at 79–80, 118 S.Ct. 998.

However, "[t]he question of how to prove that same-sex harassment is because of sex is not an easy one to answer." *Bibby v. Phil. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir.2001). Therefore, before reaching whether English has met this integral causal element in this case,

the Court reviews the two most relevant authorities on the issue—the Supreme Court's decision in *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), and the Fourth Ciruit's ruling in *Lack v. Wal–Mart Stores, Inc.,* 240 F.3d 255 (4th Cir. 2001). These cases provide the proper framework to analyze English's alleged same-sex hostile work environment claim.

### 1. *Oncale v. Sundowner Offshore Servs., Inc.*

The leading case on same-sex harassment gender discrimination claims is *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In *Oncale,* the plaintiff was a roustabout on an eight-man, all male oil rig in the Gulf of Mexico. The crew engaged in a series of offensive acts directed at the plaintiff. Oncale's co-worker's "forcibly subjected" the plaintiff to "sex-related, humiliating actions" and name calling. *Id.* at 77, 118 S.Ct. 998. Two of his co-workers physically assaulted Oncale in a sexual manner and another threatened him with rape. *See id.* Oncale's employer knew about his male co-worker's unwelcome conduct. *Id.* Oncale asserted a claim of gender discrimination against his employer.

The Supreme Court held that Oncale could state a claim for gender discrimination by members of the same-sex under Title VII where the discrimination was "because of sex." *Id.* at 79–80, 118 S.Ct. 998. Noting the novelty, and perhaps the difficulty in applying Title VII's workplace gender harassment prescription to same-sex claims, the Court set forth several instructions concerning the "because of sex" prong.

[C]ourts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the **challenged conduct typically involves explicit or implicit proposals of sexual activity;** it is rea-

sonable to assume those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, *if there were credible evidence that the harasser was homosexual.* But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. *A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.* A same-sex harassment plaintiff may also, of course, *offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.* Whatever evidentiary route the plaintiff chooses to follow, *he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex.*

*Id.* at 80–81, 118 S.Ct. 998 (emphasis added) (citations omitted).

*Oncale* explains that Title VII only applies to behavior so objectively offensive as to alter the terms and conditions of the victim's employment. *See id.* at 81, 118 S.Ct. 998; *see also Harris,* 510 U.S. at 21, 114 S.Ct. 367. Further, "in same-sex (as in all) cases" the court's judgment "requires careful consideration of the social context in which the particular behavior occurs and is experienced by the victim." *Oncale,* 523 U.S. at 81, 118 S.Ct. 998. *Oncale* directs that the court must ensure that it does not "mistake ordinary socializing in the workplace—such as male-on-male horseplay ... for discriminatory 'conditions of employment.'" *Id.* Reliance on "[c]ommon sense, and an appropriate sen-

sitivity to social context, will enable courts and jurors to distinguish between simple teasing or roughhousing among members of the same-sex." *Id.* at 82, 118 S.Ct. 998.[7]

### 2. *Lack v. Wal–Mart Stores, Inc.*

In *Lack v. Wal–Mart Stores, Inc.*, the Fourth Circuit looked to *Oncale* for guidance on the question of "because of sex" under a same-sex harassment claim pursuant to West Virginia's Human Rights Act, the state analogue to Title VII. 240 F.3d 255, 260–61 (4th Cir.2001). In *Lack*, the plaintiff was employed as a male cashier at Wal–Mart and claimed that he was allegedly sexually harassed by his male supervisor because of the plaintiff's sex. Bragg, the male supervisor of the cashiers at the Wal–Mart store, allegedly made rude and lewd comments to the plaintiff and other male cashiers, the female cashiers, and would ogle the anatomy of the female customers at the checkout counters. *See id.* at 258. Female employees, including the plaintiff's original co-plaintiff, lodged sexual harassment complaints against Bragg.

Bragg aimed several comments directly toward the plaintiff. For instance, on one occasion Bragg asked the plaintiff to enter the cloakroom. When the plaintiff informed Bragg that he was off the clock, Bragg responded "[o]h good, I am too" and motioned as if he were going to unzip his pants. *Id.* Bragg also commented to Lack, in the presence of other workers, that Lack was "F*cking all the [female] cashiers" and "that is why the manager wanted to see him." *Id.* On another occasion, Bragg approached Lack at his checkout station and asked for a small bag, but not the "small bag between your legs."

*Id.* Bragg routinely made sexual comments such as having a "penis butter and jelly sandwiches" for lunch and ending phone calls with "spank me very much." The plaintiff considered these comments to be delivered in a "sexual manner." At the store's Christmas party, Bragg went so far as to approach the plaintiff in front of his co-workers, grabbing his crotch and say "[h]ey, Chris, here is your Christmas present." *Id.*

In analyzing Bragg's conduct under the applicable case law, the *Lack* court drew several guiding principles from *Oncale*. First, the court recognized that the plaintiff faces a "formidable obstacle" in proving the causation or "because of sex" element in a same-sex harassment case. *Id.* at 260. Second, in proving this element, the court emphasized *Oncale's* instruction that "whatever evidentiary route the plaintiff chooses to follow, *he or she must prove that the conduct at issue was not merely tinged with offensive sexual connotations, but constituted 'discrimina[tion] ... because of sex.'*" *Id.* (citations omitted) (emphasis in original). Finally, the court noted that "the causation element must be analyzed in its proper context." *Id.*

The *Lack* court also discussed the various evidentiary routes open to a plaintiff in proving that the alleged harassment was "because of sex." For instance, "[s]ince a hostile work environment claim is fundamentally a sex discrimination claim, a male plaintiff must establish that the harasser ... treated him differently or with greater hostility, because he is a man." *Id.* at 261. The court discussed another evidentiary route, which it identified as the "earnest

---

7. Although the Court made this pronouncement during its discussion of the severity prong of a same-sex discrimination claim, courts have applied *Oncale's* instruction concerning context to the element of because of sex. *See, e.g., Davis v. Coastal Int'l Security,* *Inc.,* 275 F.3d 1119, 1123–24 (D.C.Cir.2002) (relying on *Oncale's* teachings to assess the "constellation of surrounding circumstances" when determining whether harasser's conduct was because of sex).

sexual solicitation" theory. *Id.* Traditionally, under this theory, the plaintiff raises an inference of harassment in a male-female situation where the conduct is due to the explicit or implicit solicitation of a sexual encounter with the plaintiff. *See id.* The same inference may be made in a male-male situation, where the plaintiff offers credible evidence that the harasser is a homosexual. *See id.*

Applying these principles, the Fourth Circuit held that the plaintiff had failed to show that Bragg's conduct was "because of sex." Although Bragg's behavior was admittedly vulgar, and even sex-specific, Bragg's conduct did not satisfy the causation element. First, the court found that the plaintiff could not rely simply "on the sex-specific nature of the 'F*cking the cashier' or 'small bag' comments, without producing plausible evidence that such comments were animated by Bragg's hostility to [the plaintiff] as a man." *Id.* at 261. Further, the "sexual message conveyed by the cashier comment" was ambiguous because it could be perceived as a degrading comment toward men and women. *Id.* at 261 n. 7.

Second, the court rejected plaintiff's claim that Bragg's comments supported an inference that Bragg's conduct could be reasonably perceived as a sexual overture. The court pointed out that Bragg's "facially sexual remarks must be evaluated according to their common usage—however vulgar the usage may be." *Id.* (citations omitted). Bragg's comments "could not be reasonably construed as an 'earnest sexual solicitation' because he neither proposed sex nor initiated it (as by touching [the plaintiff])." *Id.* In addition, Bragg did not limit his lewd behavior to the plaintiff, or to men. *See id.* The fact that Bragg made crude comments to the male and

female cashiers undermined the plaintiff's same-sex harassment claim to a "substantial extent." *Id.* at 262. Under these circumstances, Lack could have opted for yet a third evidentiary avenue and offered "direct comparative evidence about how the alleged harasser treated members of both sexes." *Id.* (quoting *Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998). Finding that Lack failed to offer such evidence, the court concluded that a jury could not conclude that Bragg's conduct was because of sex.

■ In sum, gleaning from *Oncale*, *Lack*, and other recent circuit court decisions, there are at least three possible evidentiary avenues open to a plaintiff to demonstrate that the alleged harasser's conduct was "because of sex." *Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998; *Lack*, 240 F.3d at 260–62. *See also Davis*, 275 F.3d at 1123; *Rene v. MGM Grand Hotel*, 243 F.3d 1206, 1208–09 (9th Cir.2001). First, the plaintiff may show that the alleged harasser's behavior constituted an earnest sexual solicitation. *See Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998; *Lack*, 240 F.3d at 260–61. *See also Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir.2001) ("same-sex harassment can be seen as discrimination because of sex ... where there is evidence that the harasser sexually desires the victim."). Second, the plaintiff may demonstrate that the harasser displayed a general hostility to males in the workplace. *Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998; *Lack*, 240 F.3d at 260; *Bibby*, 260 F.3d at 262. Third, under certain circumstances a plaintiff may offer direct comparative evidence about the harasser's treatment of men and women. *See Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998; *Lack*, 240 F.3d at 262; *Rene*, 243 F.3d at 1209.[8]

---

8. This does not mean to suggest that the foregoing are the only means available to a plaintiff to prove that same-sex harassment was

because of sex. *See Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir.1999) ("we discern nothing in the Supreme Court's *On-*

### 3. English's same-sex sexual discrimination claim.

█ English makes several arguments in an attempt to satisfy the essential "because of sex" element. First, English contends that Dutchburn "had sexual designs" for the Plaintiff. Second, English argues that since Dutchburn directed his conduct at men, rather than women, the comparative evidence demonstrates that the harassment was because of sex.[9] Neither of English's arguments withstand summary judgment.

#### a. Context

█ When evaluating whether harassment was because of sex "*Oncale* holds that context matters." *Davis*, 275 F.3d at 1126. *See also Lack*, 240 F.3d at 261 ("causation element must be analyzed in its proper context."); *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000) ("according to *Oncale* and *Price Waterhouse*, we must consider any sexually explicit language . . . within the context of all of the evidence of harassment in the case. . . ."). *Oncale* directs the district courts to consider context to ensure that they do not mistake "male-on-male horseplay" or "simple teasing or roughhousing among members of the same-sex" for gender discrimination. 523 U.S. at 81–82, 118 S.Ct. 998. Therefore, the Court must first review Dutchburn's actions within the proper context to determine whether a reasonable inference can be drawn that English was discriminated against because of his sex.

The majority of Dutchburn's conduct occurred in a predominantly male environment. Only two women worked in the dealership and both were separated from the area where English, Dutchburn and the other male sales consultants worked. The record demonstrates that English, Dutchburn and the other male sales consultants worked in an open area, separated into cubicles with little privacy, where conversations between co-workers could be easily overheard. (Defs.' Mem. Ex. 26, Scott Brewer Aff. ¶ 13; Ex. 27, Eric Schulthics Aff. ¶ 2).

Dutchburn had a reputation at the dealership for being annoying and obnoxious. Although he bothered several male sales consultants in addition to English, he also annoyed the few women who worked at the dealership. For instance, Dutchburn's manager Ms. Newell stated that Dutchburn "got on just about everyone's nerves." (Newell Aff. ¶ 3). The record also paints a picture of an office atmosphere where several of the male sales consultants engaged in or encouraged horseplay. For instance, Dutchburn persuaded a fellow co-worker to help him perform the "Harry Vagina" prank on English. Many of the sales consultants "talked and joked among themselves about

---

*cale* decision indicating that the examples it provided were meant to be exhaustive rather than instructive."). For instance, the Third Circuit recognizes that a plaintiff may be able to prove same-sex discrimination by providing "evidence that the harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender." *Bibby*, 260 F.3d at 262–63 (citations omitted).

9. English also appears to rely solely on the sex-specific nature of Dutchburn's statements to argue that Dutchburn's "comments and actions are clearly based on sex." English's final argument is easily dispatched. *Lack* makes clear that English cannot rely on the sex-specific nature of some of Dutchburn's comments without producing some plausible evidence that Dutchburn's comments were driven by a hostility to English as a man. 240 F.3d at 261. English does not even allege that Dutchburn's conduct was motivated by an animus against English because of his gender, much less provide evidence of Dutchburn's hostility toward English because he is a man.

Dutchburn's behavior." (Ryan Aff. ¶ 5). When Serone observed Dutchburn pressing his crotch against English's shoulders, Serone laughed, apparently considering the act some sort of a joke. Even English admitted that he initially perceived Dutchburn's behavior as nothing more than male-on-male horseplay. For instance, English conceded that he at first thought that Dutchburn's "salami" comment was a joke because "usually guys don't say that unless it's a joke." (English Dep. at 62, 74–76).

### b. Earnest sexual solicitation.

■ When viewed in its proper context, Dutchburn's conduct cannot reasonably be perceived as being motivated by English's gender under any of English's proffered theories. First, the evidence does not evince that Dutchburn's behavior amounts to an earnest sexual solicitation. Dutchburn may have taunted English with sexually tinged comments and teasing, but English does not provide any evidence that Dutchburn propositioned him. Dutchburn's "salami" comment was not only initially considered by English as a joke, but was also directed to no one in particular. Dutchburn's request that English "smoke the peace pipes . . . you know the bones" with Dutchburn is ambiguous at best. *See Lack*, 240 F.3d at 262 n. 7 (noting ambiguity of sex specific comments). The phrase could mean anything from an invitation to mend fences to smoking illicit drugs.

Further, Dutchburn's "salami" and "bones" comments, as well as his comment on the size of another employee's penis, "must be evaluated according to their common usage." *Id.* at 262 n. 8. "When ex-

pressions such as 'F*ck me' and 'kiss my ass' are used by men speaking to other men, often 'their use has no connection whatsoever with the sexual acts to which they make reference—even when they are accompanied . . . with crotch-grabbing gesture.' " *Id.* (quoting *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir.1997)); *See also Davis*, 275 F.3d at 1124. Ordinarily, sexually tinged comments are "simply expressions of animosity or juvenile provocation, and there is no basis in the record that [Dutchburn's] usage was any different." *Davis*, 275 F.3d at 1124 (quoting *Johnson*, 125 F.3d at 412) (granting summary judgment on same-sex claim because plaintiff failed to demonstrate that vulgar terms were motivated by harasser's sexual desire for victim).[10]

Similarly, a review of Dutchburn's unwelcome touching along with Dutchburn's comments fail to raise an inference that Dutchburn's overall behavior amounted to sexual propositioning. For instance, Dutchburn's slap on English's behind, accompanied by a "Hi Chuckles" and "we need to bond" comment, cannot reasonably be construed as an earnest sexual solicitation. The comments and act were made in front of other co-workers and on their face did not propose a sexual tryst. Even Dutchburn's most reprehensible act, pressing his genitals against English's shoulder, cannot be reasonably construed as a sexual overture when reviewing the evidence in its totality. Dutchburn was a boor who frequently annoyed and touched his co-workers. The act in question was done in view of other co-workers and was not followed by a proposal for sex. And much to

---

**10.** Similarly, Dutchburn's frequent comments and questions about English's intimate relations with his wife may be sex-specific, but they hardly imply a desire for a homosexual encounter. In fact, Dutchburn's frequent comments about his girlfriends and English's relations with his wife further undercut any reasonable inference that Dutchburn sought to initiate an affair with English. Furthermore, Dutchburn's comment that he loved English "like a stepson" and Dutchburn's persuasion of a fellow employee to make the "Harry Vagina" comment have nothing to with homosexual activity.

Dutchburn's twisted delight, he even garnered a few laughs from fellow co-workers for the offense. When viewed in light of the surrounding circumstances, the evidence of Dutchburn's comments and his physical touching of English amount to teasing and horseplay, rather than harassment because of sexual attraction.

An additional ground for rejecting English's earnest solicitation theory is English's failure to provide any "credible evidence" that Dutchburn is a homosexual. *See Oncale,* 523 U.S. at 80–81, 118 S.Ct. 998; *Lack,* 240 F.3d at 262.[11] English claims that he thinks Dutchburn was gay and alerted Serone of this belief. Notably, English failed to mention this belief in any of his numerous complaints to the HRC or the EEOC. However, Defendants submit affidavits from twelve Pohanka employees who worked with English and Dutchburn. Not a single co-worker states that he or she believed Dutchburn was a homosexual or had reason to believe that Dutchburn was gay. English also concedes that Dutchburn never told English that he was a homosexual. Conversely, English presents no evidence that Dutchburn had any reason to believe that English was gay.

In other words, English has "no reason (other than the behavior of which he complains) to believe that [Dutchburn] is a homosexual." *Davis,* 275 F.3d at 1123 (rejecting sexual solicitation theory because, *inter alia,* plaintiff's evidence of harassers' homosexuality was based on harassers' conduct). English cannot rely on his subjective belief that Dutchburn was gay to meet his evidentiary burden. *Cf. Williams*

*v. Cerberonics, Inc.,* 871 F.2d 452, 459 (4th Cir.1989) (citations omitted) ("[w]e have recognized that generalized testimony by an employee regarding his subjective belief ... is insufficient to make an issue for the jury in the face of proof showing an adequate, nondiscriminatory reason for discharge"); *Rountree v. Fairfax v. Cty. Sch. Bd.,* 933 F.2d 219, 223 (4th Cir.1991) (unsupported allegations will not defeat a properly supported summary judgment motion).

English's subjected belief of Dutchburn's homosexuality stands on especially tenuous grounds here, where it "appears plain on the record as a whole that the statements or conduct in question were nothing other than vulgar provocations having no causal relationship to [the plaintiff's] gender as a male." *Johnson,* 125 F.3d at 413. Contrary to the limited number of cases where courts have inferred the harasser's homosexuality from the underlying acts, the instant case does not involve "conduct [that] goes far beyond the casual obscenity." *Shepherd,* 168 F.3d at 1010. This is not a case where the harasser's conduct went beyond a "friendly slap on the buttocks." *Id.* (finding that reasonable jury could find that harasser was gay where harasser made numerous explicit comments concerning homosexual sex, exposed his penis "four or five times weekly" to the plaintiff, and " 'rubbed himself' into an erection as he threatened to sexually assault the plaintiff.").

In sum, even viewing the facts in the light most favorable to English, his evi-

---

11. This is not a case, like *Oncale,* where the homosexuality of the harasser is an undisputed fact. *See Equal Employment Opportunity Commission v. Harbert–Yeargin, Inc.,* 266 F.3d 498, 522 (6th Cir.2001). In discussing the earnest sexual solicitation theory in the context of same-sex discrimination, most federal courts assume that the harasser is homosexual. *See Bibby,* 260 F.3d at 262 ("Thus, when a gay or lesbian supervisor treats a same-sex subordinate in a way that is sexually charged, it is reasonable to infer that the harasser acts as he or she does because of the victim's sex."); *Harbert–Yeargin, Inc.,* 266 F.3d at 522 n. 6 ("When the harasser is a homosexual ... the conclusion that the harassment was gender based is defensible.").

dence is nonetheless insufficient to withstand summary judgment on his same-sex discrimination claim based on a sexual solicitation theory.

### b. Direct comparative evidence.

*Oncale* makes clear, however, that a harasser need not be motivated by a sexual desire to satisfy the "because of sex" prong. 523 U.S. at 80, 118 S.Ct. 998. Relying on *Oncale's* instruction, English appears to argue that because there exists comparative evidence that Dutchburn treated men differently from women, English has met his burden of demonstrating that Dutchburn's conduct was because of sex.

But this line of argument fails as well. As a threshold matter, contrary to English's contentions, some of Dutchburn's behavior was also directed to the few women in the office as well. Dutchburn's female supervisor, for instance, noted that Dutchburn "got on just about everyone's nerves. He was also a 'touchy feely' person who tended to touch people as he talked." (Newel Aff. ¶ 3). The fact that Dutchburn harassed women in the office weighs against English's same-sex claim to a substantial extent. *See Lack*, 240 F.3d at 262.

Moreover and more importantly, evidence that Dutchburn's obnoxious behavior was directed more at men than women cannot, standing alone, constitute discrimination because of sex. *Oncale* instructs that in "same-sex (as in all) harassment cases, [the] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by the target." 523 U.S. at 81, 118 S.Ct. 998. As discussed above, the alleged harassment here occurred on a showroom floor populated by mostly men. The sales consultants office cubes had little privacy. The atmosphere was akin to a male locker room where Dutchburn was known for his lewd behavior and even occasionally enlist-ed other co-workers to carry out his obnoxious pranks. Many of the co-employees laughed at, or implicitly encouraged, Dutchburn's behavior toward English.

Under such circumstances, English cannot meet his evidentiary burden by simply presenting facts that Dutchburn harassed the men in the office more often than the women. Even under the direct comparative evidence route, English still bears the burden of "prov[ing] that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." *Oncale*, 523 U.S. at 81, 118 S.Ct. 998. The disparity in treatment between men and women does not in and of itself demonstrate that Dutchburn's harassment was based on gender because women were predominantly absent from the showroom floor. *See Rene*, 243 F.3d at 1208 (finding that same-sex discrimination plaintiff "cannot avail himself of [the direct comparative evidence] route because he worked on the 29th floor of the MGM Grand Hotel, where only men were employed.").

Moreover, in *Equal Employment Opportunity Comm'n v. Harbert–Yeargin, Inc.*, the Sixth Circuit rejected a district court's jury instruction that the plaintiff could meet the causal element of a sex discrimination claim by simply demonstrating that the male harasser had subjected only male employees to offensive conduct of a sexual nature. 266 F.3d 498, 521 (6th Cir.2001) (reversing entry of judgment as matter of law against defendants on plaintiff's same-sex discrimination claim). As the *Harbert–Yeargin* court noted, "if the harassment is specifically directed at men, and not women, it doesn't have to be of a sexual nature." *Id.* This is precisely, however, what English would have the Court hold in this case.

*Harbert–Yeargin* is particularly instructive because it addressed a same-sex dis-

crimination claim based on "goosing," the practice of grabbing or patting a co-worker's genitals or buttocks. *Id.* at 503, 266 F.3d 498. The court in *Harbert–Yeargin* held that although the co-workers engaged in gross, vulgar, male-on-male horseplay (much more objectively offensive than the conduct at issue here), the plaintiff failed to demonstrate that the conduct was discrimination "because of sex." *Id.* at 520–522. The court found that plaintiff's same-sex discrimination claim failed because he did not provide evidence that the harassers' roughhousing was motivated by sexual desire, general hostility to men in the workplace or that the harassers punished plaintiff for failing to comply with gender stereotypes. *See id.* at 521–22.

 Similar to *Harbert–Yeargin,* the instant case is "gross, vulgar, male horseplay in a male workplace. It was the classic example of men behaving badly." *Id.* at 512. But "simple teasing and roughhousing among members of the same sex" cannot constitute a sexual discrimination claim. *See Oncale,* 523 U.S. at 82, 118 S.Ct. 998. "Boorish behavior may exist apart from any propensity to discriminate." *Equal Employment Opportunity Comm'n v. R & R Ventures,* 244 F.3d 334, 339 (4th Cir.2001). English bears the burden of producing some evidence that Dutchburn harassed him because of his gender. "Title VII is not a generic anti-harassment statute … It does not follow … that every 'sexually' hostile work environment will ground a Title VII claim. In fact, if the environment is just sexually hostile without an element of gender discrimination, it is not actionable." *Harbert–Yeargin, Inc.,* 266 F.3d at 520.

Reviewing the "constellation of surrounding circumstances" and applying basic "common sense," *Oncale,* 523 U.S. at 81–82, 118 S.Ct. 998, the record reveals that Dutchburn's conduct directed toward English and other co-workers, amounted to expressions of juvenile provocation and offensive behavior driven by Dutchburn's desire to tease or humiliate English and others. But English does not provide sufficient evidence for a reasonable jury to infer that such conduct was driven by an unlawful design such as gender discrimination. *See Harbert–Yeargin,* 266 F.3d at 521–22. *Cf. Spearman,* 231 F.3d at 1085 (rejecting same-sex discrimination claim where record showed that harassers' conduct was motivated by factors other than plaintiff's gender).

Therefore, English's same-sex discrimination claim based on a theory of direct comparative evidence in this case must be rejected. To hold otherwise would open the door to litigation to theoretically any form of sexually tinged teasing or roughhousing among male workers solely on the grounds that such horseplay occurred. *Oncale* specifically counsels against taking such a leap. This Court refuses to descend down a slippery slope that would lower Title VII's bar to reach the juvenile behavior of a co-worker who simply cannot behave like a grown man. *See Harbert–Yeargin,* 266 F.3d at 522.[12]

### III. CONCLUSION

 The Court by no means condones Dutchburn's conduct in this case. Dutchburn's actions were vulgar and obnoxious by any measure and no doubt were humiliating to English. "It is easy to forget, however, that Title VII deals with discrimination in the workplace, not morality or vulgarity." *Harbert–Yeargin,* 266 F.3d at 519. The courts have a duty "to ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton,* 524 U.S. 775, 786, 118 S.Ct.

---

**12.** The Court does not reach the remaining elements in English's Title VII claim because the Court's ruling on the "because of sex" prong is dispositive.

2275, 141 L.Ed.2d 662 (1998). Courts must be wary of confusing gender discrimination with "simple teasing or roughhousing of members of the same-sex." *Oncale*, 523 U.S. at 82, 118 S.Ct. 998.

Here, English has not offered sufficient evidence to support a reasonable inference that Dutchburn's behavior was motivated by an earnest desire to have sex with English or that his conduct was motivated by English's gender rather than horseplay. Because English has failed to demonstrate that Dutchburn's harassment was "because of sex," summary judgment on English's Title VII claim is appropriate.

For the reasons stated above, it is hereby

ORDERED that Defendants' Motion for Summary Judgment is GRANTED.

The Clerk is directed to forward a copy of this Order to the counsel of record.